**COMMERCIAL CONTRACTORS, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 97–5005.

United States Court of Appeals, Federal Circuit.

Sept. 4, 1998.

Rehearing Denied Nov. 5, 1998.

W. Bruce Shirk, Powell, Goldstein, Frazer & Murphy, LLP, Washington, DC, argued, for plaintiff–appellant. With him on the brief was Mary Baroody Lowe.

Donald E. Kinner, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Washington, DC, argued, for defendant–appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director. Of counsel was Sharon Y. Eubanks.

Before RADER, BRYSON and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

Following a trial, the United States Court of Federal Claims held that Commercial Contractors, Inc., (CCI) knowingly submitted false or fraudulent claims with respect to a government construction project. *See Commercial Contractors, Inc. v. United States,* No. 612–89C (Fed.Cl. Aug. 29, 1995). The court entered judgment against CCI for more than $14 million. *See Commercial Contractors, Inc. v. United States,* No. 612–89C (Fed.Cl. Aug. 6, 1996). We affirm in part, reverse in part, and remand.

I

In October of 1987, the Army Corps of Engineers awarded a contract to CCI to construct several segments of the Telegraph Canyon Channel in Chula Vista, California, as part of a flood control project. The contract required CCI to excavate the areas in which the channel segments were to be built, to build the channel segments by setting up forms and pouring concrete into the forms, and to backfill the excavated areas surrounding the channel segments. The contract contained detailed specifications that governed all aspects of the work to be performed, including drawings indicating the lines to which CCI was required to excavate, quality control standards specifying the hardness that the poured concrete was required to achieve before the supporting forms could be removed, and miscellaneous other provisions specifying such factors as the proper composition and required compaction density of the backfill materials.

Joseph Augustine, CCI's president and owner, and William Zondorak, CCI's project manager, supervised the project for CCI. Mr. Augustine oversaw the field work, while Mr. Zondorak was primarily responsible for handling the paperwork, including the billing. The contract required CCI to hire a licensed surveyor to perform the specified surveying work, including the quantity surveys upon which payments were to be based. Michael Pallamary was the principal of Precision Survey & Mapping (PSM), the subcontractor CCI hired to perform that work.

CCI completed the contract on July 24, 1989. Shortly before that date, Mr. Pallamary wrote to the Corps' headquarters expressing concerns with CCI's performance under the contract. Mr. Pallamary wrote a second letter following the completion of the contract, again noting deficiencies in CCI's performance. That letter was forwarded to the Army's Criminal Investigation Division

(CID), which conducted an investigation of the charges.

On November 13, 1989, CCI filed suit in the Court of Federal Claims asserting a number of claims for additional payment under the contract. The suit was twice suspended pending resolution of the CID investigation into the allegations of criminal fraud by CCI. Instead of pursuing the criminal investigation, however, the government decided to assert counterclaims in CCI's suit based on the anti-fraud provision of the Contract Disputes Act (CDA), 41 U.S.C. § 604, the False Claims Act (FCA), 31 U.S.C. §§ 3729–3731, and the Forfeiture of Fraudulent Claims Act (FFCA), 28 U.S.C. § 2514.

The Court of Federal Claims granted the government's motion to bifurcate the trial so as to resolve the government's counterclaims before addressing CCI's affirmative claims. The counterclaims were tried between October 18 and October 30, 1993. After several rounds of post-trial briefing, the court entered a final judgment against CCI in the amount of $14,190,161.85 under the FCA and the CDA, and it ordered CCI's affirmative claims to be forfeited pursuant to the FFCA. The court's judgment rested on its finding that CCI submitted claims for payment that it knew to be false or fraudulent with respect to six categories of contract work: (1) excavation quantities; (2) backfill quantities; (3) backfill composition; (4) shoring; (5) channel length; and (6) concrete testing. CCI appeals from the judgment with respect to each of the six categories.

## II

The False Claims Act provides, in pertinent part, that anyone who "knowingly presents ... a false or fraudulent claim for payment" to the government shall be liable "for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a). The government must prove the elements of the cause of action by a preponderance of the evidence. *See* 31 U.S.C. § 3731(c). For purposes of the FCA, a contractor is deemed to have known that a claim it submitted was false *if it had actual knowledge of the falsity of the claim or if it acted in deliberate ignorance or reckless disregard* of the truth or falsity of the claim. *See* 31 U.S.C. § 3729(b).

■ The Contract Disputes Act provides that a contractor who is unable to support any part of a claim because of a misrepresentation of fact or fraud on the part of the contractor shall be liable to the government for the unsupported part of the claim, as well as for the government's costs expended in reviewing the claim. *See* 41 U.S.C. § 604. To recover under the CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with an intent to deceive or mislead the government. *See* 41 U.S.C. § 601(7). Although the statute does not prescribe a standard of proof, the "preponderance of the evidence" standard has been applied in the past, *see Al Munford, Inc. v. United States*, 34 Fed. Cl. 62, 67 (1995), *vacated on other grounds*, 86 F.3d 1178, 1996 WL 252834 (Fed.Cir.1996) (Table), and we agree that the traditional civil standard is appropriate here. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

■ The Forfeiture of Fraudulent Claims Act provides that "[a] claim against the United States shall be forfeited ... by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." 28 U.S.C. § 2514. To prevail under the FFCA, the government is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims. *See Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed.Cir.1994); *McCarthy v. United States*, 229 Ct.Cl. 361, 670 F.2d 996, 1003–04 (1982).

## III

### 1. Excavation Quantities

The contract called for CCI to excavate the channel to the lines specified in the contract drawings. CCI was to be compensated for the excavation portion of the project

based on the volume of earth excavated. The contract also stated that "[a]ll excavation outside of the excavation lines shown on the drawings will be considered as being for the convenience of Contractor and will not be included in the measurement for payment." Contract § 1B, ¶ 3.1.

The Court of Federal Claims found that CCI excavated less than the contract drawings required, but submitted cross-sections and quantity surveys indicating that it had excavated up to the contract lines. CCI does not dispute those findings. Furthermore, the court found that CCI billed the Corps for additional excavation which was not required by the contract, but which CCI did to accommodate a traveling metal form system that CCI used to speed up the project.

At trial, CCI argued that its excavation claims were not false because it interpreted the contract as providing for payment based on the volume of earth computed from the contract drawings, regardless of whether CCI actually excavated up to the lines specified in those drawings. The court rejected CCI's contract interpretation, principally because that interpretation directly contradicted the express terms of the contract, which provided that CCI was required to excavate "accurately to the lines, grades, and elevations shown" in the drawings. The court noted that Mr. Pallamary, CCI's own subcontractor, repeatedly warned Mr. Zondorak that he did not believe that the contract permitted CCI to excavate less than the contract drawings called for, or to submit cross-sections that did not reflect the actual amounts excavated. In addition, the court noted that as an engineering graduate of the Naval Academy, Mr. Zondorak should have realized that the excavation lines specified in the contract were an engineering requirement: It was essential to excavate the indicated areas and to backfill those areas with properly compacted materials in order to provide adequate support for the channel walls and thereby ensure that the channel was structurally sound.

The court further found that CCI acted knowingly in submitting the false excavation claims. CCI's contract interpretation, the court held, was untenable in light of the unambiguous provisions of the contract. CCI knew that Mr. Pallamary, a reputable surveying professional, strongly disagreed with its interpretation of the contract, yet CCI failed to seek guidance from the Corps with respect to how much it was required to excavate and whether it should have been billing only for actual excavation. Mr. Zondorak even went so far as to prohibit a meeting requested by Mr. Pallamary to discuss the contract with the Corps. The court thus concluded that CCI either knew or acted in reckless disregard of whether the cross-sections and quantity surveys it submitted in support of its claims were false.

On appeal, CCI contends that it did not knowingly submit false excavation claims because its interpretation of the contract was reasonable and adopted in good faith and because, far from concealing its interpretation of the contract from the Corps, CCI actually disclosed its method of calculating the submitted claims to a Corps representative.

■ CCI relies on two pieces of evidence in support of its contention that its contract interpretation was reasonable. First, CCI points to the following contract provision:

A survey of the site shall be made prior to commencement of work, and all measurements will be based on this survey without regard to any changes in the site that may be made between the excavation lines and grades indicated on the drawings or staked in the field and the ground surfaces as indicated by the above mentioned survey. Alterations may be necessary due to the nature of the materials excavated and methods used in performing the work, but such alterations shall not change the measurement for payment from the original lines as specified herein.

Contract § 1B, ¶ 3.1. Additionally, CCI relies on testimony from Mr. Zondorak that James Barron, the Corps' original project engineer (now deceased), directed Mr. Zondorak to submit quantity surveys before starting any work—a direction that CCI interpreted as indicating that it was to be paid based on the lines specified in the contract drawings.

Like the trial court, we reject CCI's contention that its interpretation of the contract was reasonable. The portion of the contract

quoted above simply states that all quantity measurements were to be based on the ground lines indicated in the initial site survey, regardless of any changes that may have been made to the site due to the nature of the excavation methods and materials. The second sentence, on which CCI places great weight, does not support its argument; even if the sentence is read to suggest that CCI would be paid up to the contract's excavation lines, it cannot plausibly be read to give CCI the discretion to excavate to lines of its own choosing, as CCI contends. The contract specifies that "excavation consists of the removal and disposal of all materials within the lines and grades indicated," and that "excavation ... shall be made accurately to the lines, grades and elevations shown." In light of that unequivocal language, CCI's interpretation of the contract is untenable.

■ With respect to Mr. Barron's alleged direction to submit quantity surveys before performing any actual excavation, we note first of all that Mr. Zondorak did not testify that Mr. Barron expressly modified the contract's excavation requirements. Furthermore, Mr. Zondorak's testimony was uncorroborated and was contradicted by testimony from the Corps' contracting officials, whom the court found to be credible witnesses. Based on those credibility determinations, we uphold the court's rejection of CCI's contention that Mr. Barron interpreted and modified the contract so as to permit CCI to ignore the minimum excavation specifications for all but payment purposes. In light of the clear and unambiguous contract language, we also uphold the court's ruling that CCI's interpretation of the contract was so unreasonable as to defeat CCI's assertion that it pressed its claims based on a good faith belief of entitlement under the contract.

■ CCI's second argument is that it did not submit false claims to the government because it disclosed its method of calculating the submitted excavation claims—and thus its interpretation of the contract—to the Corps. CCI relies on two pieces of evidence to support that argument: a letter from Mr. Pallamary to Mr. Zondorak that CCI submitted to the Corps with one of its claims, and a negotiation session set up between Mr. Augustine and James Lindsay, the Corps' construction representative, for the purpose of working out an agreement with respect to the quantities excavated from certain stations along the channel.

The body of Mr. Pallamary's letter to Mr. Zondorak is as follows:

Enclosed please find the quantity calculations for the above referenced project. Please note that the template used for these calculations is based upon a ¾ to 1 slope without any consideration for the location of the easement or right of way lines. As you are aware, I am unable to determine their location in this area and as such I have simply projected the excavation lines to their logical terminus.

CCI claims that Mr. Pallamary's letter, which was submitted to the Corps with one of CCI's excavation claims, "implicitly excludes the concept of physical location," and thus served as a "clear signal" to the Corps that CCI's submissions were not based on actual excavation. We disagree. The letter indicates that Mr. Pallamary was not sure whether the slope of the excavated area reached all the way to the ground line, or whether it was cut off at an earlier point because otherwise it would have extended beyond the channel easement. Thus, the Corps may have been put on notice that Mr. Pallamary was not able to calculate the precise amount of earth excavated at the particular stations alluded to in the letter. The letter did not, however, put the Corps on notice that CCI was following a general policy of excavating less than the contract lines called for, even well within the easement boundaries, and that it was submitting claims as if it had excavated the full amounts.

■ With respect to the negotiation between Mr. Augustine and Mr. Lindsay, CCI claims that, as the Corps' field representative, Mr. Lindsay would have known the amounts of earth actually excavated by CCI, so that upon seeing Mr. Augustine's drawings he should have realized that CCI had not excavated the amounts for which it was requesting payment. CCI relies on testimony elicited from Mr. Lindsay on cross-examination, in which he acknowledged that Mr. Augustine expected to be paid up to the contract lines and that Mr. Augustine never told him that the cross-sections CCI submit-

ted were intended to represent actual excavation. That testimony, according to CCI, establishes that Mr. Lindsay must have been aware of the method that Mr. Augustine was using to derive his claims for payment.

The Court of Federal Claims considered that argument but rejected it in light of testimony from the Corps' contracting officials. In particular, on direct examination Mr. Lindsay testified that he had no way to measure the excavation in the field precisely, that Mr. Augustine did not explicitly inform him that CCI was basing its claims on contract lines rather than on actual excavation, and that he expected the submitted cross-sections to correspond to the contract lines and to reflect the actual excavation performed by CCI. William Gallegos, the Corps' resident engineer, also testified that he was not told of, did not know about, and never would have agreed to CCI's interpretation of the contract. Moreover, the court noted that Special Clause 8 of the contract required. CCI to conduct quantity surveys and to use data derived from those surveys to "comput[e] the quantities of work performed." The Corps was thus entitled to rely on the calculations prepared from those quantity surveys—and not on Mr. Lindsay's own surveys or calculations—in determining the work performed by CCI.

The court made reasonable credibility determinations and carefully weighed the evidence presented by both parties in reaching its conclusion that CCI failed to show that the Corps knew the submitted cross-sections and quantity surveys did not reflect the actual work performed by CCI. Because CCI has not persuaded us that the court's finding on that issue is clearly erroneous, we affirm the determination that CCI knowingly submitted false claims for excavation.

## 2. Backfill Quantities

The court found that CCI overstated the backfill quantities in two respects. First, because CCI did not excavate up to the excavation lines specified in the contract, it also did not fill in compacted materials up to those lines. As mentioned above, CCI does not dispute that finding, but argues instead that it reasonably interpreted the contract as contemplating payment for excavation and fill based on the contract lines, regardless of

whether CCI actually performed that work in full. We have already rejected CCI's interpretation of the contract as well as its argument that it disclosed that interpretation to the Corps. , We therefore uphold the court's finding that CCI submitted false fill claims in that respect.

■ In addition, the court found that CCI placed additional fill above the fill lines specified in the contract drawings and billed the Corps for that extra fill, even though the contract provided that CCI was only to be paid for fill placed "between the excavation and structure lines and the fill limit lines." Contract § 1B, ¶ 4.1. Again, CCI does not dispute those findings, but argues that the contract gave it discretion to place fill over and above the fill lines in order to satisfy what CCI calls a "slope to drain" requirement. For support, CCI relies on one of the contract drawings, in which an arrow labeled "slope to drain" points to an inclined fill line. That drawing, however, does not indicate that the contract contains any "slope to drain" requirement other than filling up to the indicated fill line. Accordingly, we hold that CCI's interpretation of the contract was unreasonable in light of the other provisions of the contract that unambiguously required CCI to work up to but not over the lines indicated in the contract drawings.

■ CCI nevertheless argues that it did not knowingly submit false claims because it disclosed to the Corps that it placed additional fill beyond the contract fill lines. In support, CCI cites a letter that it sent to the Corps after it commissioned a second surveyor (instead of PSM) to perform an "as built" site survey. The letter stated: "[The second surveyor] took the as built information and plotted it on the initial profiles made by Precision Survey and Mapping. The elevations are listed and the area of increased fill or cut is shaded." We do not agree that the letter put the Corps on notice that CCI was adding fill above the fill lines. CCI commissioned the second survey because it believed PSM's initial survey was not accurate. The letter thus highlighted the differences between the second survey and PSM's initial survey, but it did not reveal that CCI had

added fill over the contract's fill lines, as CCI contends.

■ The trial court also held that CCI submitted a false claim by billing the Corps for the second survey. CCI argued that the second survey was necessitated by errors and omissions in the contract plans at the construction easement and right-of-way boundaries. The court found that CCI failed to identify any errors in the contract drawings that required a second survey. On appeal, CCI argues that the record is "replete with references to ... errors in the plans." The alleged errors, however, all pertain to lack of information about the construction easement, not to the fill lines. CCI does not explain why uncertainty about the edges of the construction site required a second survey, as opposed to recomputation of the fill quantities based on PSM's initial survey. Because the court's findings with respect to the second survey are not clearly erroneous, we sustain the court's conclusion that CCI improperly submitted a claim for the second survey as part of its false fill claims.

■ Finally, CCI argues that it cannot be held liable for its excavation and fill claims because the effect of such a decision would be to expose any contractor who submits claims under an erroneous contract interpretation to liability under the FCA or the CDA, even if the contractor did not deliberately conceal or misstate any facts to the government. The FCA, however, holds a contractor liable only if he knowingly submits false claims, and the CDA holds a contractor liable only if he acts with intent to deceive or mislead the government. The question for the court in cases involving issues of contract interpretation is whether the contractor's asserted interpretation is so plainly lacking in merit that the requisite state of mind can be inferred.

■ If a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable, absent some specific evidence of knowledge that the claim is false or of intent to deceive. Yet when a contractor adopts a contract interpretation that is implausible in light of the unambiguous terms of the contract and other evidence (such as repeated warnings from a subcontractor or the fact

that the interpretation is contrary to well-established industry practice), the contractor may be liable under the FCA or the CDA even in the absence of any deliberate concealment or misstatement of facts. Under such circumstances, when the contractor's purported interpretation of the contract borders on the frivolous, the contractor must either raise the interpretation issue with the government contracting officials or risk liability under the FCA or the CDA. *See United States v. Aerodex, Inc.,* 469 F.2d 1003, 1008 (5th Cir.1972) (contractor's failure to disclose the manner in which it thought it could comply with the contract "indicates nothing less than an intention to deceive").

### 3. Backfill Composition

The contract permitted CCI to use certain of the excavated materials as backfill, but it prohibited CCI from filling the excavated areas with construction debris or "other objectionable material." Contract § 2F, ¶ 6.1.2. That prohibition was designed to ensure that the backfill consisted only of properly compacted materials that would provide adequate support for the channel. The contract required CCI to dispose of all extra fill and debris properly and in full compliance with environmental regulations.

The trial court found that CCI improperly buried debris under and alongside the channel, and that it knowingly submitted false claims for properly filling the excavated areas and for clearing the excess fill and debris. The court based its findings in part on testimony from William Burkey, one of CCI's heavy equipment operators. Mr. Burkey testified that Mr. Augustine told him not to haul any debris off the project site and that, pursuant to that direction, Mr. Burkey and other CCI employees buried debris in numerous locations along the floor and sides of the channel. Mr. Burkey's testimony was corroborated by the sworn declarations of David Grell and Jimmy Lyons, two heavy equipment operators who also worked on the project. Although Mr. Grell and Mr. Lyons recanted their declarations at trial, the declarations stated that, at the direction of Mr. Augustine, various CCI employees improperly buried debris and other unsuitable materi-

als that were supposed to be hauled off the project site. Mr. Grell and Mr. Lyons also provided free-hand drawings that identified specific locations where they had buried debris.

CCI argues first that the Grell and Lyons declarations are hearsay, and that the court erroneously admitted them into evidence under Rule 801(d)(1)(A) of the Federal Rules of Evidence, which authorizes the admission of prior inconsistent statements given under oath at trials, hearings, or other proceedings. CCI waived that argument, however, by not objecting to the admission of the declarations on that ground at trial. *See* Fed.R.Evid. 103(a)(1) (opponent of evidence must state the specific ground of objection); 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 103.13[1] (Joseph M. McLaughlin ed., 2d ed.1997). Moreover, although the court discussed Rule 801(d)(1)(A), it admitted the Grell and Lyons declarations under the residual hearsay exception, *see* Fed.R.Evid. 807 (formerly 803(24)), based on its conclusion that the declarations "carried sufficient indicia of reliability to warrant their consideration for the truth of the matter asserted." *Commercial Contractors, Inc. v. United States,* No. 612–89C, slip op. at 48 n. 20 (Fed.Cl. Aug. 29, 1995). On appeal, CCI does not challenge the trial court's decision that the Grell and Lyons declarations were admissible under that provision. We therefore reject CCI's hearsay argument for that reason as well.

As to CCI's argument that the court improperly admitted a CID interim report containing a summary of other statements by Grell, Lyons, and Burkey, that argument was raised for the first time in CCI's reply brief and is therefore not properly before us. *See Enercon v. United States Int'l Trade Comm'n,* 151 F.3d 1376 (Fed.Cir. 1998). In any event, the court did not rely significantly on the summaries of the statements, so any error in their admission would be harmless.

CCI attacks the credibility and relevance of the remaining evidence on which the court based its finding that CCI improperly buried debris in the backfill, arguing for example that Mr. Burkey had a drinking problem that affected his memory and that

any buried debris was located outside the project property. The trial court, however, credited Mr. Burkey's testimony, which was corroborated by the Grell and Lyons declarations. In light of the court's credibility determinations, CCI has not persuaded us that the trial court's findings on the backfill issue are clearly erroneous.

### 4. Shoring

The contract required CCI to "remove and dispose of all existing structures and obstructions for channel and embankment construction, except as otherwise noted on the drawings." Contract § 2B, ¶ 4.2. However, CCI was required to preserve existing structures and improvements outside of the excavation area, including any such structures located on property adjacent to the construction site. *See id.* ¶ 8.1 (existing improvements shall remain, except in the area required for excavation); Federal Acquisition Regulation (FAR) 52.236–9(b), 48 C.F.R. § 52.236–9(b) (1987) (incorporated into the contract) ("The Contractor shall protect from damage all existing improvements and utilities (1) at or near the work site and (2) on adjacent property of a third party...."). In order to prevent damage to existing structures that were to be preserved, CCI was required to provide shoring or "whatever means may be necessary to adequately support" those structures. Contract § 2D, ¶ 3. The contract provided that CCI was to bear the cost of any required shoring, *see id.* § 1B, ¶ 3.2.4, as well as the cost of repairing any damage it caused to existing structures, *see id.* § 2B, ¶ 9.1.

A retaining wall stood on private property that abutted a portion of the south side of the construction site. As shown in the contract drawings, the retaining wall was built very close to the property line, so that CCI had a clearance of less than 3.5 feet in which to work in that area, which was substantially less than the 5-foot clearance CCI expected to have in other work areas. In addition, the wall's footing actually crossed over the property line and into the construction easement. There was conflicting testimony about how much of the wall's footing crossed over the property line; the court found that the foot-

ing did not jut out far enough to interfere with the construction.

Mr. Augustine testified that he concluded it was cheaper to destroy the wall and rebuild it rather than to work around it. The property owner, however, refused to grant CCI permission to intrude on the adjacent property or to destroy the wall. CCI therefore submitted a plan to shore the area near the wall, and after the Corps approved the plan, CCI began to excavate in that area. The court found that CCI excavated at least 6 feet below the level of the wall footing along the entire length of the wall without providing any shoring, in contravention of construction standards that prohibited vertical excavation more than 3 feet below footings and that required shoring to be installed before beginning such excavation. Pursuant to direction from Mr. Augustine, CCI employees continued digging below the footing, and the wall collapsed soon thereafter. The property owner sued CCI for the damage caused to its property, and CCI's insurer settled the claim for $22,500.

CCI submitted three claims pertaining to the narrow work area and the collapsed wall. Two of the claims were predicated on the assertion that the narrow clearance caused by the wall and its encroaching footing created a differing site condition that required CCI to use a different shoring system and a different concrete form system than the systems it normally used. The third claim was for reimbursement to CCI's insurer for the damages paid to the property owner. The court found that CCI violated the FCA in submitting the three claims, because CCI knew or should have known about the narrow clearance when it submitted its bid (and thus it was not entitled to increased costs either for a different shoring system or for a different form system), and because CCI knew it was at fault for failing to shore the wall properly (and thus it was not entitled to reimbursement for the damages paid to the owner of the wall).

 CCI disputes the court's findings. With respect to the narrow clearance, CCI argues that the actual clearance it had in the wall area was 2 feet, not 3.5 feet, as shown in the contract drawings, and that it did not learn of that significantly narrower clearance until Mr. Pallamary noticed it in December

1987, two months after CCI submitted its bid. This is a different argument than the one CCI made to the trial court and to the Corps when CCI submitted its claims for extra work due to a differing site condition. At trial, both Mr. Zondorak and Mr. Augustine testified that they originally expected to have a 5-foot clearance in the wall area, and that the clearance of less than 5 feet required use of a more expensive form system. However, Mr. Augustine admitted at trial that the contract drawings showed that the clearance was "basically three feet." Thus, the contract made clear that CCI would not be able to use its regular form system in the area of the retaining wall. In light of Mr. Augustine's admission, we uphold the court's finding that CCI knowingly submitted false claims for extra work due to a differing site condition. In reaching our conclusion, we note also that CCI never introduced any evidence that the form system it would have used had the clearance been 3.5 feet could not have been used with a 2-foot clearance. Thus, the claims submitted by CCI are not supportable even under CCI's new argument.

 Turning to the claim for reimbursement for the cost of repairing the collapsed retaining wall, CCI does not dispute the court's finding that it failed to provide adequate shoring and that it was thus responsible for the wall's collapse. CCI argues instead that the wall was an obstruction that it had the option of destroying. CCI's argument is premised on the provision of the contract that specifies that "[t]he Contractor shall clear the site … and remove and dispose of all existing structures and obstructions for channel and embankment construction, except as otherwise noted on the drawings." Contract § 2B, ¶ 4.2. CCI maintains that it had no obligation to preserve the wall because the drawings did not indicate that the wall was to be saved. CCI's argument fails, however, because the provision it cites applies only to structures on the construction site. Section 52.236–9(b) of the FAR, 48 C.F.R. § 52.236–9(b) (1987), governed CCI's duty with respect to off-site structures. That provision states in part:

The Contractor shall protect from damage all existing improvements and utilities (1) at or near the work site and (2) on adjacent property of a third party, the locations of which are made known to or should be known by the Contractor. The Contractor shall repair any damage to those facilities, including those that are the property of a third party, resulting from failure to comply with the requirements of this contract or failure to exercise reasonable care in performing the work.

Because the wall was on an adjacent property, CCI was required to protect it and to pay for any damage that CCI caused to the wall. CCI's argument that the wall could be destroyed because its footing encroached into the construction easement by a few inches is belied by the fact that CCI sought permission from the owner of the adjacent property to encroach on the property and to remove the wall. Accordingly, we sustain the court's determination that CCI knew that it was required to protect the wall and that it was responsible for repairing any damage it caused to the wall, and thus that CCI knowingly submitted a false claim for reimbursement of the damages paid on account of the wall's collapse.

### 5. Channel Length

At the west end of the construction project, the channel empties into a bay across a marsh and wetland area. The trial court found that in order to avoid difficult construction due to the wet ground caused by the tide, CCI moved the survey stakes on the south side of the west end of the channel and terminated the channel's south groin 17.5 feet short of the location indicated in the contract. In making those findings, the court relied on testimony from CCI employee William Burkey, who related that he discussed the wet ground problem with Mr. Augustine. Mr. Burkey testified that Mr. Augustine approved the idea of moving the south groin stakes so as to avoid having to work in the wet area and that Mr. Augustine was present when Mr. Burkey moved several of the south groin stakes. The court rejected testimony from Mr. Augustine that he had never directed anyone to move stakes in the south groin area, as well as testimony from Mr. Zondorak that Mr. Schneider, the Corps'

project engineer, instructed him not to build the south side of the channel as shown in the plans, but instead to connect the south groin to an existing seawall in that area.

CCI argues that the court improperly credited Mr. Burkey's testimony because it was inconsistent and was contradicted by the testimony of other witnesses, particularly CCI employee David Grell. The court, however, found that Mr. Grell's testimony was impeached by his prior inconsistent statements, and determined that the events took place essentially as described by Mr. Burkey. We accord the trial court broad discretion in determining credibility because the court saw the witnesses and heard the testimony. *See Bradley v. Secretary of the Dep't of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed.Cir. 1993). CCI's challenges to the testimony of Mr. Burkey do not convince us that the court committed clear error in crediting Mr. Burkey's testimony over that of Mr. Grell.

CCI argues that the contract drawings did not give it adequate guidance as to the proper location of the south groin and that it never received proper clarification from the Corps. Although the original contract drawings were incomplete, in that they did not set out all the necessary curve data for the south groin, the court found that CCI requested and received adequate clarification from Mr. Schneider, the Corps' project engineer, about the location of the curve of the south groin. That finding is not clearly erroneous, and it answers CCI's argument that Mr. Schneider never supplied sufficient directions to enable CCI to determine where to build the south groin.

CCI further contends that Mr. Schneider's clarification conflicted with another clarification provided by the Corps. Even if that is true, however, CCI was obligated to inquire as to which of the two clarifications was correct. It was not appropriate for CCI to ignore the two clarifications in favor of a third option of its own choosing, *i.e.*, to shorten the groin and connect it to the existing seawall.

Finally, CCI argues that because it constructed all but 17.5 feet of the 7000–foot channel, it delivered essentially all of what it

was supposed to deliver and therefore did not submit a claim for work that was not performed. A 17.5-foot shortfall, however, is not de minimis, particularly in light of the fact that, as the evidence showed, the Corps was especially concerned with the structure of the west end of the channel, which was designed to minimize the channel's ecological impact on the marsh area into which the channel opened. We therefore affirm the court's finding that CCI knowingly submitted a false claim for construction of the full-length channel as shown in the contract drawings, when in fact it did not build such a channel.

### 6. Concrete Testing

The Corps designed the Telegraph Canyon Channel to withstand a "hundred-year" flood—that is, a flood of a magnitude that generally occurs only once every 100 years. In order to ensure that the channel met that design goal, the contract required the contractor to use concrete that contained only certain specified combinations of materials and that met certain compressive strength requirements.

The channel itself was built by setting up forms and pouring concrete into the forms. To avoid compromising the structural integrity of the channel, the contract prohibited CCI from removing the forms before the poured concrete had hardened to 80% of the contractually required strength. That condition was to be determined by pouring cylinders of concrete at the same time the concrete was poured into the forms and subsequently determining when the test cylinders were capable of withstanding a specified pressure. The test cylinders were to be stored either in the channel itself or as near to the channel as possible and to be maintained under the same conditions as the concrete in the forms. The contract also required the contractor to leave the forms up for at least 24 hours after every pour.

In building the channel, CCI decided to use a traveling form system, because it would allow the project to move more quickly. CCI's goal was to build the channel based on a one-pour-per-day cycle—i.e., to remove the forms from the previous day's pour and set the forms up for a new pour every 24 hours.

CCI thus requested permission from the Corps to cancel the 24-hour restriction on the removal of forms. The Corps granted CCI permission to remove the forms in less than 24 hours provided that the 80% strength requirement was met. Still not satisfied with the rate at which the project was progressing, however, CCI requested permission to heat the poured concrete in place so as to speed up the curing process. The Corps denied that request.

The trial court found that CCI improperly heated the test cylinders and thus "may have subjected the concrete structure to undue pressure before it had reached the requisite percentage of its design strength." *Commercial Contractors, Inc. v. United States*, No. 612–89C, slip op. at 59 (Fed.Cl. Aug. 29, 1995). The court based its finding on a declaration from Mr. Grell that he observed David Lee, CCI's quality control system manager, heat test cylinders with a small heater on several occasions. Mr. Grell's declaration further stated that both Mr. Lee and Mr. Augustine told him that the purpose of heating the cylinders was to make them cure fast so that it would appear that the concrete in the channel was also curing fast. Mr. Lee admitted at trial that he had "applied an external heat source" to some of the test cylinders, but he claimed that he had done so on only two or three occasions and for only five to ten minutes. Mr. Lee explained that his purpose had been to dry off some damp cylinders that had inadvertently been left outside overnight. The court rejected Mr. Lee's proffered explanation in light of the fact that the contract required the test cylinders to be maintained under the same conditions as the poured concrete, and that no witness from CCI had been able to explain why leaving the cylinders outside was problematic. The court concluded that Mr. Lee's tampering with the test cylinders constituted a gross violation of the contract's quality control requirements and thereby rendered CCI's claims for concrete work false because the claims certified that the poured concrete and the test cylinders had hardened under the same conditions.

CCI argues that the court's conclusion is clearly erroneous because the evidence does

not support the finding that Mr. Lee's tampering with the test cylinders constituted a gross violation of the contract's quality control requirements. According to CCI, Mr. Lee admitted heating the cylinders on only two or three occasions for five to ten minutes. Mr. Lee's conduct cannot constitute a gross violation of the quality control requirements, CCI argues, in light of the government's admission that that amount of heating would not have any effect on the cylinders, and in light of the fact that the cylinders all tested uniformly.

The trial court's finding with respect to the test cylinder tampering is not clearly erroneous. First, the trial court was entitled to conclude that Mr. Lee's explanation for heating the cylinders was implausible. As the court pointed out, even assuming that the cylinders needed to be dried off (which seems unlikely given that they were to be maintained under the same conditions as the poured concrete), Mr. Lee never explained why it was preferable to use a heat source, as opposed to some other method such as toweling the cylinders off. Mr. Lee also failed to explain why he heated the cylinders outside of normal work hours. Moreover, Mr. Lee's testimony was controverted by Eugene Braden, a special agent with the Army's Criminal Investigation Division, who testified that in the course of his investigation of the Telegraph Canyon Channel contract Mr. Lee told him that he had applied heat to the cylinders "on numerous occasions for extended periods of time."

We also agree with the trial court that the fact that the cylinders all tested uniformly does not help CCI's argument, since that outcome is consistent with the possibility that CCI heated all of the test cylinders. Furthermore, even if the heating did not actually speed up the curing time, Mr. Grell's declaration supports the trial court's conclusion that CCI took steps to make it appear that the concrete was curing faster and that CCI thus violated the contract's quality control standards. We therefore sustain the court's determination that CCI knowingly submitted false claims for concrete work that was certified to have hardened under the same conditions and to the same degree as the test cylinders.

## IV

### 1. Measure of Damages

■■■ CCI argues that the trial court's judgment must be reversed with respect to three of the government's counterclaims—backfill composition, channel length, and concrete testing—because the government failed to prove that it suffered actual damages as a result of CCI's false claims. CCI is correct in its assertion that the government is entitled to recover treble damages under the False Claims Act only if it can demonstrate that it suffered actual damages. *See Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir.1994).

■■■ The government asserts that "even a demonstration that the sections of the channel in question were completely interchangeable with appropriately-constructed sections in terms of performance would not erase CCI's liability." The government's argument is based on the following passage in *United States v. Aerodex, Inc.,* 469 F.2d at 1007: "The mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the government agency." That passage stands for the proposition that a contractor can be held liable for submitting a false claim even if the goods it delivered are of the same quality as the goods specified in the contract, provided that the contractor acted with the requisite knowledge that the corresponding claim was false. But while the contractor may liable in that situation, it is liable only for FCA penalties, not damages. *See United States v. Dyncorp, Inc.,* 136 F.3d 676, 681 (10th Cir.1998) ("there is authority to the effect that the government need not prove damages to establish liability under the FCA, but can instead recover statutory penalties for a violation even absent any damages"); *United States v. Advance Tool Co.,* 902 F.Supp. 1011, 1017 (W.D.Mo.1995) ("[C]ivil penalties are recoverable under the FCA even in situations such as the one at bar where the United States has failed to show actual damages."), *aff'd,* 86 F.3d 1159, 1996 WL 292235 (8th Cir.1996) (Table). In order to recover FCA damages, the government must prove that it sustained an actual

**1372**

loss as a result of the contractor's false or fraudulent claim.

The Supreme Court has identified the proper measure of the government's loss as "the difference between the market value of the [goods] it received and retained and the market value that the [goods] would have had if they had been of the specified quality." *United States v. Bornstein,* 423 U.S. 303, 317 n. 13, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). CCI argues that the trial court should not have awarded the government damages with respect to three of its counterclaims because the government failed to prove actual damages under the *Bornstein* formula. CCI cites two trial court cases in support of its argument: *Advance Tool Co.,* 902 F.Supp. at 1017 (government not awarded damages because it failed to present evidence of the fair market value of the goods it received), and *Ab–Tech Constr., Inc. v. United States,* 31 Fed. Cl. 429, 434 (1994) (government not entitled to damages because it failed to show that there was a difference in value between what it paid for and what it received), *aff'd,* 57 F.3d 1084, 1995 WL 358218 (Fed.Cir.1995) (table).

■ We agree with CCI that the normal measure of damages is the difference in value between what the government was supposed to get and what it actually got from the contractor. *See Bornstein,* 423 U.S. at 317 n. 13, 96 S.Ct. 523 (1976); *see also Restatement (Second) of Contracts* § 347 & cmt. b (1981) (injured party is entitled to recover loss in value, which in the case of defective or partial performance is the difference between the value of the performance if there had been no breach and the value of the performance as actually rendered); 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.9 (1990) (same). In some situations, however, it is not possible for an injured party to prove the loss in value caused by the contractor's deficient performance. In such cases, the Restatement of Contracts allows the injured party to recover damages computed on an alternative basis. *See Restatement (Second) of Contracts* §§ 347 cmt. b, 348 cmt. a (1981).

Section 348 of the Restatement sets forth some of the alternative bases for computing damages. One of the alternatives provided is the cost of remedying defects:

If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on ... the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.

*See also id.* § 348 cmt. c ("Sometimes, especially if the performance is defective as distinguished from incomplete, it may not be possible to prove the loss in value to the injured party with reasonable certainty. In that case he can usually recover damages based on the cost to remedy the defects."); *Daff v. United States,* 78 F.3d 1566, 1574–75 (Fed.Cir.1996) (affirming recovery of cost of testing and repairing defective goods).

If remedying the defects in the contractor's performance includes undoing some of the contractor's improper work, however, the cost of those remedial measures may be very high. The Restatement precludes the injured party from recovering the cost of remedying defects if that cost is clearly disproportionate to the probable loss in value caused by the defects. *See Restatement (Second) of Contracts* § 348(2)(b) (1981); *see also* 3 Farnsworth, *supra,* § 12.13.

■ The cost of remedying defects is not regarded as disproportionate if the defects significantly affect the integrity of a structure being built. In that setting, the injured party is entitled to recover the cost of remedying the defects despite the fact that the cost may be very high. *See* 3 Farnsworth, *supra,* § 12.13, at 237; *Restatement (Second) of Contracts* § 348 illus. 3 (1981). Stated differently, structural defects are deemed to cause such a great loss in value that the cost of remedying such defects is almost never considered to be out of proportion to that loss.

### 2. Challenged Counterclaims

Because of the nature of the project at issue in this case, it is difficult to determine the loss in value caused by CCI's deficient performance. There is no market in which the government can sell the channel, which makes it difficult to evaluate the difference in market value between the channel as speci-

fied by the contract and the channel as built. While the government might have sought to adduce evidence to show how much less it values the channel as built than the channel as contracted for, the government introduced no such evidence at trial. Thus, the court could not and did not award damages based on loss in value. Instead, the court looked to the cost of remedying CCI's deficiencies as an alternative measure of damages and awarded damages on that basis. *See Daff,* 78 F.3d at 1574–75; *Restatement (Second) of Contracts* § 348 (1981).

■ In defending the trial court's damages award, the government argues that the court properly awarded the full replacement cost because CCI built the channel without complying with the quality control standards specified in the contract. That argument, however, goes too far: An injured party is not entitled to recover full replacement cost for any deviation from the exact terms of the contract, however minor. In the unusual case in which actual loss in value cannot be ascertained, the injured party may recover the replacement cost, but only if that cost is not clearly disproportionate to the probable loss in value caused by the defects in question. We analyze the proportionality issue in the context of each of the specific counterclaims challenged by CCI.

### a. Channel Length

■ With respect to the channel's length, CCI argues that the channel as built substantially complies with the contract specification. Stated differently, CCI's argument is that the probable loss in value to the government due to the shortened south groin is so small as to render the cost of repairing that defect disproportionate to the loss. We disagree.

As we have noted, the west end of the channel was a focus of particular concern for the Corps, and the structure of that end of the channel was designed to minimize the channel's impact on the wildlife in the marsh area into which the channel opened. In particular, the channel was designed with flared walls at the end so as to dissipate the energy of flood waters flowing down the channel before they hit the marsh area. The contract called for the north and south groins to be built evenly along a line perpendicular to

the direction of the channel. Corps witnesses testified that a shortened south groin allows flood waters to enter the marsh area sooner and with greater force on the south side of the channel, possibly destroying some of the marine life in that area. In view of that evidence, which CCI has not challenged, we do not regard the cost of repairing the shortened south groin as disproportionate to the probable loss in value caused by that deficiency. Accordingly, we sustain the court's use of the cost of repairing the shortened south groin as the basis for its damages award.

### b. Backfill Composition

■ The cost of remedying the deficiencies caused by CCI's improper backfill is substantial, as it requires the affected sections of the channel to be destroyed and rebuilt. Nevertheless, those defects are of a structural nature, and to the extent that the government proved that those defects significantly affect the structural integrity of the channel, the government is entitled to recover the costs of remedying them, as appropriately trebled under the FCA.

As mentioned previously, one of the Corps' goals in designing the channel was to make it strong enough to withstand a "hundred-year" flood. The contract contained several provisions that were directed toward that design goal: The concrete had to meet certain compressive strength requirements, and it had to be supported by forms until it reached a certain level of hardness. In addition, the channel walls were required to be supported by properly compacted backfill consisting of appropriate materials such as sand and sandy clays. Debris such as broken concrete and pavement were specifically not to be used as part of the backfill.

The government introduced evidence that CCI improperly buried debris in the backfill, and that engineers from both the Corps and the City of Chula Vista observed subsiding and depressed areas near the channel, which they believed were caused by improperly compacted backfill. In addition, Ken Yeh, one of the project engineers who worked on the design of the Telegraph Canyon Channel, testified that debris buried in backfill creates

voids and prevents the backfill from compacting properly, which would put undue stress on the channel that could ultimately cause it to crack.

CCI argues that the depressions observed by the government's witnesses do not prove that there is debris buried in the backfill or that any such debris has caused any damage, because one of the government's expert witnesses testified that depressions can occur as a result of factors other than improperly compacted backfill. As we have discussed, however, there is sufficient evidence in the record to support the trial court's conclusion that CCI buried debris in the backfill. Furthermore, although CCI correctly points out that one of the government's witnesses testified that depressions in the ground can occur for other reasons, that witness testified that he believed the depressions he observed near the channel were caused by voids in the backfill and that such voids can occur if debris is placed in backfill in a haphazard manner. That evidence, in conjunction with Mr. Yeh's testimony concerning the undue stress that would be put on the channel by backfill that contains unsuitable debris and thus is not compacted properly, was sufficient to establish that CCI's deficient backfill work significantly affected the structural integrity of the channel. Accordingly, we uphold the trial court's ruling that the government is entitled to recover the cost of removing the debris and rebuilding the affected sections of the channel, as appropriately trebled under the FCA.

### c. Concrete Testing

██ As with the deficiencies caused by the unsuitable composition of the backfill, the cost of remedying the deficiencies caused by CCI's improper concrete testing is considerable, because it requires the affected sections of the channel to be destroyed and rebuilt. In order to recover that cost, the government was required either to establish that CCI's deficient work significantly affected the channel's structural integrity, or to show in some other way that the cost of remedying the defective work was not clearly disproportionate to the probable loss in value caused by the defects.

CCI argues that the government did not introduce evidence that the forms were removed before the concrete had achieved its required strength, or that the concrete suffered any damage (such as cracking) as a result of the alleged early form removal. In support of its contention, CCI relies on the testimony of Mr. Yeh, one of the government's expert witnesses, who admitted that he did not see any settlement cracking or other signs of unusual distress when he inspected the channel. CCI also points to CID reports from an investigation undertaken for the specific purpose of determining whether the alleged heating of the test cylinders caused the concrete formwork to be removed early and, if so, whether the early form removal had caused significant damage to the channel by putting undue pressure on the structure before the concrete reached the requisite percentage of its design strength. The CID reports state that the cracks found in the channel were "non-structural," that "[i]t is improbable that early form removal was the cause of [the] cracking [that was] found," that "a sudden failure of the structure are [sic] not likely to take place," and that "no immediate action is required to repair the cracks."

In response, the government places great emphasis on the fact that Mr. Lee admitted that he applied a heat source to the test cylinders, and that he told Mr. Grell and CID agent Braden that his purpose in heating the cylinders was to make it appear that the concrete was curing fast so that CCI could accelerate the removal of the forms. According to Mr. Grell's declaration, Mr. Augustine also said that the purpose of heating the test cylinders was to make it appear that the concrete in the channel was curing fast. Nonetheless, while the government's evidence establishes that CCI falsely submitted claims that certified that its concrete work complied with the contract's quality control standards, that evidence does not demonstrate that the structural integrity of the channel was significantly affected as a result of CCI's actions.

The only evidence that the government introduced with respect to the effect that CCI's tampering with the test cylinders had on the channel was testimony from Mr. Yeh that some of the cracks he observed in the

channel were "more than" or "larger than" normal temperature hairline cracks. Mr. Yeh, however, did not elaborate on the import or significance of those cracks. In fact, he admitted on cross-examination that although he specifically inspected the channel for evidence of settlement cracking or unusual distress, he did not find any such evidence. Moreover, we find it significant that at the end of the CID investigation, which was undertaken specifically for the purpose of determining whether early form removal had caused any damage to the channel's structural elements, the CID reports concluded that there was no evidence that any such damage had occurred.

In sum, the evidence presented by the government fails to show that the structural integrity of the channel was significantly affected by the quality control violations. Because the government did not introduce any other evidence tending to show that CCI's tampering with the test cylinders resulted in a channel of much less value than if CCI had fully complied with the cylinder testing requirements, we conclude that the very high cost of tearing down and rebuilding the supposedly affected sections—$4,325,670.50 (before trebling)—is clearly disproportionate to the probable loss in value caused by CCI's deficient work. Accordingly, we reverse the court's award of damages for the replacement of the sections of the channel allegedly affected by CCI's improper concrete work. However, we sustain the court's imposition of a $10,000 FCA penalty for the submission of a false claim certifying that the concrete work complied with the contract's quality control standards.

## V

In conclusion, we affirm the court's findings that CCI violated the FCA through its knowing submission of false or fraudulent claims, as well as the CDA through its submission of false or fraudulent claims with an intent to deceive or mislead the government. In addition, we affirm the court's order forfeiting CCI's affirmative claims under the FFCA, and we affirm the court's award of damages with respect to (1) excavation quantities, (2) backfill quantities, (3) backfill composition, (4) shoring, and (5) channel length. With respect to the sixth and final counter-

claim—concrete testing—we affirm the court's imposition of a $10,000 FCA penalty, but we reverse the court's award of treble damages. We remand the case to the Court of Federal Claims with instructions to enter judgment for the government in accordance with this opinion.

Each party shall bear its own costs for this appeal.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*