## In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3122, 10-3342 & 10-3423

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANCHOR MORTGAGE CORPORATION and
JOHN MUNSON,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 210—**Matthew F. Kennelly**, *Judge*.

ARGUED OCTOBER 31, 2012—DECIDED MARCH 21, 2013

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. After a bench trial, a district judge found that Anchor Mortgage Corporation and its CEO John Munson lied when applying for federal guarantees of 11 loans. 2010 U.S. Dist. LEXIS 81298 (N.D. Ill. Aug. 11, 2010). The False Claims Act provides substantial penalties for fraud in dealing with the United

States and its agencies. 31 U.S.C. §3729(a)(1). The district court imposed a penalty of $5,500 per loan, plus treble damages of about $2.7 million.

Defendants' lead argument on appeal is that they did not have the necessary state of mind—either actual knowledge that material statements were false, or a suspicion that they were false plus reckless disregard of their accuracy. See 31 U.S.C. §3729(b)(1)(A). The district court inferred knowledge, and that finding stands unless clearly erroneous. Fed. R. Civ. P. 52(a)(6); *Anderson v. Bessemer City*, 470 U.S. 564 (1985).

Anchor submitted two kinds of false statements: first, bogus certificates that relatives had supplied the down payments that the borrowers purported to have made, when it knew that neither the borrowers nor any of their relatives had made down payments (falsity meant that the borrowers and their families had no equity in the properties, with correspondingly little reason to repay the loans; borrowers who could not afford down payments also were less likely to have the means to repay); second, Anchor represented that it had not paid anyone for referring clients to it, but in fact it paid at least one referrer (Casa Linda Realty).

Appellants ask us to ignore the bogus-certificate frauds on the ground that CEO Munson did not know about their falsity. But the district judge found that Alfredo Busano, head of one of Anchor's branch offices, knew what was going on. Corporations such as Anchor "know" what their employees know, when the employees acquire knowledge within the scope of their

employment and are in a position to do something about that knowledge. See, e.g., *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375 (7th Cir. 2010). Busano acquired this knowledge as part of his duties at Anchor, and he could have rejected any loan application that had false information about the down payment. Instead he certified to the federal agency that the information was true. Busano's knowledge was Anchor's knowledge.

As for the referral fees: Munson says that he thought them proper because federal regulations permit compensation of a joint venture in which a mortgage broker has an interest. Munson testified that he thought that such a "controlled business arrangement" (the regulatory term at the time) had been established. But Munson conceded that the final paperwork was not signed and that the payments were made to Casa Linda Realty, not the separate entity that Anchor and Casa Linda had discussed creating. Since Munson knew that no "controlled business arrangement" was in existence, the district court did not commit a clear error in finding that Munson knew that the statements to the federal agency were false.

This brings us to damages. One question is whether the district judge should have awarded double damages under §3729(a)(2) rather than treble damages under §3729(a)(1). The statute requires treble damages unless "the person committing the violation . . . furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after

the date on which the defendant first obtained the information" (§3729(a)(2)(A)). Munson reported some false claims that Anchor had submitted, and he contends that this calls for double damages.

Yet the statute does not cap damages for *every* violation just because *any* violation has been reported. Subparagraph (A) refers to "the violation"; each must be assessed separately. That's an implication of the definite article ("the") and the inescapable consequence of the temporal reference. Double damages are permissible when the defendant tells the truth "within 30 days after the date on which the defendant first obtained the information". Coming clean 29 days after submitting one false claim does not mitigate the penalty for other false claims that had been submitted months earlier.

The United States gave Munson and Anchor credit for self-reporting: it did not seek *any* penalty for the frauds he reported. The 11 claims on which the district court awarded treble damages were among Anchor's false claims that Munson never reported or attempted to correct. The agency discovered the falsity after a large fraction of Anchor's clients defaulted and an investigation turned up problems. Munson did not furnish "all information" about any of these 11 claims, so the district court was required to treble rather than double the damages.

But treble what? The hanging paragraph at the end of §3729(a)(1) says that the award must be "3 times the amount of damages which the Government sustains because of the act of that person." The district judge

added the amounts the United States had paid to lenders under the guarantees and trebled this total. Then he subtracted any amounts that had been realized, by the date of trial, from selling the properties that secured the loans. For example, the Treasury paid $131,643.05 on its guaranty of a particular loan. Three times that is $394,929.15. The real estate mortgaged as security for that loan sold for $68,200. The judge subtracted the sale price from the trebled guaranty; the result of $326,729.15 represented treble damages. To this the judge added the $5,500 penalty, for a total of $332,229.15. The process was repeated for the other parcels.

Defendants propose a different approach. Like the district judge, they start with $131,643.05, but they immediately subtract the $68,200 that the United States realized from the collateral. The net loss is $63,443.05. Treble that, and the result is $190,329.15. Add $5,500 for a total of $195,829.15. Repeat for the other parcels. We call defendants' preferred approach the "net trebling" method, and the district court's (which the United States endorses) the "gross trebling" method.

Section 3729(a) calls for trebling "the amount of damages which the Government sustains". That's an unfortunate expression, because "damages" usually represents the amount a court awards as compensation. That makes §3729(a) circular. The word for loss usually is "injury" or "damage"—or just "loss." The United States has not argued that the use of "damages" rather than "damage" or "injury" or "loss" has any significance, however. So we must decide whether to use net loss or gross loss.

The United States maintains that Anchor and Munson have not preserved this question for appellate resolution. We conclude that they have. Their lawyer raised the subject in arguments to the district judge at the close of the evidence (pages 337–38 of the trial transcript). Counsel asked the judge to use net trebling, though he did not cite a case. A legal point is not forfeited by omission of the best authority. See, e.g., *Elder v. Holloway*, 510 U.S. 510 (1994). As we discuss below, defendants needed to track down a footnote in a 1976 opinion to find their best authority. Eventually they did this, and *Elder* holds that we can consider the decision's import.

The False Claims Act does not specify either a gross or a net trebling approach. Neither does it signal a departure from the norm—and the norm is net trebling. The Clayton Act, which created the first treble-damages action in federal law, 15 U.S.C. §15, has long been understood to use net trebling. The court finds the monopoly overcharge—the difference between the product's actual price and the price that would have prevailed in competition—and trebles that difference. See, e.g., *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). A gross trebling approach, parallel to the one the district court used in this suit, would be to treble the monopolist's price, then subtract the price that would have prevailed in competition. If there is a reason why the courts should use net trebling in antitrust suits and gross trebling in False Claims Act cases, it can't be found in §3729—nor does the United States articulate one.

Basing damages on net loss is the norm in civil litigation. If goods delivered under a contract are not as prom-

ised, damages are the difference between the contract price and the value of what arrives. If the buyer has no use for them, they must be sold in the market in order to establish that value. If instead the seller fails to deliver, the buyer must cover in the market; damages are the difference between the contract price and the price of cover. If a football team fires its coach before the contract's term ends, damages are the difference between the promised salary and what the coach makes in some other job (or what the coach could have made, had he sought suitable work). Mitigation of damages is almost universal.

With neither statutory language nor any policy favoring gross trebling under §3729(a), the Department of Justice has relied exclusively on one decision: *United States v. Bornstein*, 423 U.S. 303 (1976). The Court held in *Bornstein* that third-party payments are subtracted after doubling, rather than before. (At the time, doubling rather than trebling was standard under §3729.) The United States had contracted with Model Engineering for radio kits, each of which was to contain tubes that met military specifications. Model purchased the tubes from United National Labs, which represented that they were mil-spec parts. But United Labs shipped tubes that it knew did not comply with the specifications. Model incorporated them into the kits. When the United States discovered the fraud, it sued United Labs and two of its officers. Model was not liable under the False Claims Act, but it *was* liable for simple breach of contract, and it paid the United States an amount per tube that Model thought would prevent loss to the United

States. The question in *Bornstein* was whether the money the United States received from Model would be subtracted before doubling the price that United Labs had charged for the fraudulently labeled tubes. The Court held that Model's payments should not inure to United Labs' benefit and wrapped up: "the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source." 423 U.S. at 316.

Although the Department of Justice maintains that this language specifies a gross trebling approach, we do not read it so. Instead it sounds like a conclusion that "damages" depend on the acts of the person committing the fraud. Any doubt is resolved by footnote 13, which is attached to the word "source" in the language quoted above: "The Government's actual damages are equal to the difference between the market value of the tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality. C. McCormick, *Law of Damages* §42, p. 137 (1935)." Thus if mil-spec tubes were worth $40 apiece, but the tubes United Labs furnished were worth only $25, then the "actual damages" per tube were $15. That's what should have been doubled. Footnote 13 in *Bornstein* unambiguously uses the contract measure of loss, supporting a net trebling approach.

The brief for the United States contends that note 13 is dictum. Maybe so. The question presented was whether third-party payments should be subtracted before dou-

bling, not whether the market price should be subtracted from the contract price before doubling. But a court of appeals should not ignore pertinent statements by the Supreme Court. Footnote 13 was not an offhand remark. Having rejected the court of appeals' approach in *Bornstein*, the Court told it how to do the job right on remand. The footnote uses the common law's established approach to determining damages; it is not as if some law clerk were off on a lark and the Justices missed the error.

Appellate decisions since *Bornstein* generally use a net trebling approach. See, e.g., *United States ex rel. Feldman v. Gorp*, 697 F.3d 78, 87–88 (2d Cir. 2012); *United States v. United Technologies Corp.*, 626 F.3d 313, 321–22 (6th Cir. 2010); *United States v. Science Applications International Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010); *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1372 (Fed. Cir. 1998). *Feldman* holds that the United States got no value at all from a fraudulently obtained research grant, so there was nothing to subtract, but that does not detract from the fact that the court adopted a net approach. On the gross trebling side is *United States v. Eghbal*, 548 F.3d 1281, 1285 (9th Cir. 2008), a case much like this one in which the court refused to subtract (before trebling) the value of collateral the United States seized and sold. *Eghbal* relies on *Bornstein* but does not mention note 13; we do not find it persuasive.

The district judge must recalculate the award using the net trebling approach. If any of the real estate remains unsold, the parties should address how its

value is to be determined. The district court assumed that real estate in a lender's or guarantor's inventory has no value at all, so there is nothing to subtract in either a gross or a net approach. That cannot be right. Courts routinely determine the value of real property that is off the market—valuation for estate-tax purposes is one example, and valuation in condemnation proceedings is another. The United States' loss is the amount paid on the guaranty less the value of the collateral, whether or not the agency has chosen to retain the collateral. The damages should not be manipulated through the agency's choice about when (or if) to sell the property it receives in exchange for its payments.

The judgment is affirmed to the extent it finds Anchor and Munson liable, but it is reversed to the extent it adopts the gross trebling approach. The case is remanded with instructions to recalculate the award under the net trebling approach.