# Illinois Official Reports

## Appellate Court

---

### *People ex rel. Schad, Diamond & Shedden, P.C. v. My Pillow, Inc.*,
### 2017 IL App (1st) 152668

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* SCHAD, DIAMOND & SHEDDEN, P.C., Plaintiff-Appellee, v. MY PILLOW, INC., Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-2668 |
| Filed | June 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-L-7874, 12-L-6782; the Hon. Thomas R. Mulroy, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Catherine A. Battin and Nicholas M. Furtwengler, of McDermott Will & Emery LLP, of Chicago, for appellant.<br><br>Stephen B. Diamond, Tony Kim, and David Kim, of Stephen B. Diamond, P.C., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    This case requires us to consider matters of first impression arising under the Illinois False Claims Act (False Claims Act or Act) (740 ILCS 175/1 *et seq.* (West 2012)), including whether damages paid by defendant prior to final judgment should be included in, or credited against, the amount of "damages" to be trebled under the Act and whether a law firm serving both as client and attorney may recover statutory attorney fees under the Act.

¶ 2    Relator, Stephen B. Diamond, P.C., formerly Schad, Diamond & Shedden, P.C. (relator), brought this *qui tam* action on behalf of the State of Illinois under the False Claims Act (740 ILCS 175/1 *et seq.* (West 2012)). Relator alleged that defendant, My Pillow, Inc. (My Pillow), knowingly failed to collect and remit use taxes on merchandise sold at craft shows in Illinois and on Internet and telephone sales to Illinois customers as required by state law.

¶ 3    After a bench trial, the circuit court found in favor of relator as to the claims regarding Internet and telephone sales. The court awarded relator treble damages and attorney fees totaling $1,383,627.

¶ 4    We affirm the judgment in favor of relator. The evidence was sufficient to demonstrate that My Pillow acted in reckless disregard of its obligation to collect and remit use taxes on its Internet and telephone sales. The damages found by the trial court were supported by the evidence, and the trial court properly included, within the amount of damages to be trebled, those tax payments made by My Pillow before final judgment. We reverse that portion of the attorney-fees award that granted fees to relator for legal work performed by its own attorneys but otherwise affirm the fees award. We remand to the circuit court only for a recalculation of the attorney-fees award.

¶ 5                              I. FALSE CLAIMS ACT

¶ 6    The False Claims Act, formerly known as the Whistleblower Reward and Protection Act, allows the Attorney General or a private individual to bring a civil action on behalf of the State for false claims. See, *e.g.*, *State ex rel. Pusateri v. Peoples Gas Light & Coke Co.*, 2014 IL 116844, ¶ 16; see also 740 ILCS 175/1, 4 (West 2008). The Act closely mirrors the federal False Claims Act originally enacted in 1863. *Scachitti v. UBS Financial Services*, 215 Ill. 2d 484, 506 (2005); see also 31 U.S.C. §§ 3729 through 3733 (2000). Both acts provide for *qui tam* actions brought by citizens seeking to reveal fraud against the government. *People ex rel. Schad, Diamond & Shedden, P.C. v. QVC, Inc.*, 2015 IL App (1st) 132999, ¶ 30.

¶ 7    Thus, in construing the Act, Illinois courts have relied on federal courts' interpretation of the federal False Claims Act for guidance. See *id.* (and cases cited therein); accord *United States ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 702 n.4 (N.D. Ill. 2012) (court's reasoning on false claim under federal False Claims Act applied equally to state act because "Illinois courts interpreting the state act look to interpretations of the similarly worded federal [act]").

¶ 8    Relator's claim is based on section 3 of the Act. 740 ILCS 175/3 (West 2012). Section 3 states, in relevant part, that a person is liable under the Act when he

> "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or

knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State." 740 ILCS 175/3(a)(1)(G) (West 2012). For purposes of section 3, the term "knowingly" means that a person, "with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 740 ILCS 175/3(b)(1)(A) (West 2012). "[N]o proof of specific intent to defraud" is required. 740 ILCS 175/3(b)(1)(B) (West 2012).

¶ 9 This case concerns a unique form of false claim involving the failure to collect and remit use taxes on the sale of merchandise in Illinois under the Retailer's Occupation Tax Act (ROTA) (35 ILCS 120/1 *et seq.* (West 2012)) and the Use Tax Act (35 ILCS 105/1 *et seq.* (West 2012)). "ROTA and the Use Tax Act are complementary, interlocking statutes that comprise the taxation scheme commonly referred to as the Illinois 'sales tax.' " *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 362 (2009). "[B]ecause of the impracticality of collecting the tax from individual purchasers, the burden of its collection is imposed upon the out-of-state vendor." *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 418 (1996).

¶ 10 The gist of relator's complaint is that My Pillow was required to collect and remit use taxes to the State but failed to do so. This specimen of false claim is known as a "reverse false claim," in that the defendant is not alleged to have obtained money fraudulently from the government but, rather, to have failed to pay money duly owed. See, *e.g.*, *People ex rel. Beeler, Schad & Diamond, P.C. v. Relax the Back Corp.*, 2016 IL App (1st) 151580, ¶ 19 (reverse false claim is where material misrepresentation is made to avoid paying money owed to government); *State ex rel. Beeler Schad & Diamond, P.C. v. Ritz Camera Centers, Inc.*, 377 Ill. App. 3d 990, 996 (2007) ("[t]he reverse false claims provision was added to provide that an individual who makes a material misrepresentation to avoid paying money owed to the Government would be equally liable under the Act as if he had submitted a false claim to receive money" (internal quotation marks omitted)).

¶ 11 II. BACKGROUND

¶ 12 My Pillow is a Minnesota corporation involved in the sales, marketing, and distribution of pillows. The company was founded in 2004 by Mike Lindell, who is the company's chief executive officer. Lindell says he sewed the first pillows himself by hand. By 2009, the company had between 5 and 20 employees.

¶ 13 Beginning in 2010, independent contractors began selling My Pillow's products at craft shows in Illinois and throughout the country. Between April 2010 and July 2012, My Pillow sold its products at 44 craft shows in Illinois. It is no longer disputed that My Pillow collected use tax on its craft show sales and remitted all the tax to the Illinois Department of Revenue (IDOR). (Relator alleged otherwise at trial, but the court ruled in favor of My Pillow on the craft-show use taxes, and relator does not challenge that ruling on appeal.)

¶ 14 In June 2010, My Pillow began selling its products through the Internet. My Pillow did not collect sales or use tax on Internet or telephone sales to Illinois purchasers. Relator began its investigation of My Pillow in August 2011.

¶ 15 In October 2011, Lindell created and launched a detailed infomercial, for which he paid a marketing company close to $200,000. In 2011, as a result of the infomercial, the company expanded impressively. Monthly sales increased from $200,000 to $10 million. The number of

employees grew from 20 in October 2011 to 500 in a very short period of time. By February 2013, My Pillow had 650 employees.

¶ 16     My Pillow registered to do business in Illinois in July 2012. On July 13, 2012, relator filed its initial complaint under the Act, claiming that My Pillow failed to collect and remit Illinois use tax on merchandise sold at craft shows in Illinois and on its Internet sales and telephone sales to Illinois customers. Relator filed an amended complaint on October 31, 2012. The State declined to intervene, and the amended complaint was unsealed on January 15, 2013.

¶ 17     Relator filed a second amended complaint on February 26, 2013. My Pillow was served with process in March 2013.

¶ 18     In November 2013, My Pillow began to collect and remit use tax on Internet and telephone sales. My Pillow amended its sales and use tax returns, *i.e.*, the IDOR Form ST-1s, and paid a total of $106,970 in taxes it owed to Illinois on Internet and telephone sales for 2012 ($61,218) and 2013 ($45,752).

¶ 19     Relator filed a third amended complaint on April 28, 2014. In its third amended complaint, relator alleged in count I that, although My Pillow collected tax on craft show sales, it did not remit the tax to IDOR. In count II, relator alleged that My Pillow failed to collect and remit use tax on website and telephone sales.[1]

¶ 20     A two-day bench trial began on September 22, 2014. Four witnesses testified at trial: Lindell, Nicole Oestrich, Stephen Diamond, and David Kim.

¶ 21     Lindell testified that, in April or May 2010, he asked an accountant, who had been doing his tax returns for 30 years, whether he had to charge sales tax on Internet sales. According to Lindell, it was his understanding that he would have to charge sales tax on Internet purchases within Minnesota but not on those that were shipped out of state. Lindell, however, never sought his accountant's advice or consulted with anyone about the collection, remittance, or payment of Illinois sales and use tax.

¶ 22     Lindell testified that, in July 2013, he told an employee, David Boyd, to begin collecting tax on Internet and telephone sales. Boyd did not follow Lindell's directions, and Lindell fired him for insubordination in November 2013. Lindell also testified that My Pillow contacted its customers and collected tax on Internet and telephone sales to Illinois customers for the prior years.

¶ 23     Nicole Oestrich was the My Pillow employee who filed its Form ST-1 with IDOR. Both Lindell and Oestrich testified that the independent contractors at the craft shows collected tax on the products they sold and either remitted the tax at the shows or gave it to My Pillow to remit with its monthly Form ST-1.

¶ 24     Stephen Diamond testified regarding relator's investigation of My Pillow and the discovery obtained from My Pillow.

¶ 25     Relator's attorney, David Kim, testified regarding relator's investigation of My Pillow. He also testified as to relator's damages calculations.

¶ 26     The trial court found that My Pillow did not violate the Act with respect to the craft shows because relator failed to meet its burden of proving that My Pillow did not remit all of the taxes it received from the 44 craft shows it attended from April 2010 through July 2012. But the

---

[1]In its prior complaints, relator had alleged that My Pillow had failed to "collect" taxes on craft show sales but dropped this allegation after conducting discovery.

- 4 -

court found in favor of relator on its claims concerning My Pillow's Internet and telephone sales. The court found Lindell was not credible and further found that, "based on all the evidence, My Pillow knowingly violated [the Act] because it recklessly disregarded its obligation to remit tax on Internet and telephone sales."

¶ 27    The court reserved ruling on damages until after the matter had been fully briefed. The court awarded relator treble damages and attorney fees totaling $1,383,627. This calculation came from computing the damages, trebling them, and adding penalties, for an amount of damages—the proceeds of the action—of $889,637. Then the court subtracted the $106,970 in taxes My Pillow paid prior to trial for a final amount of damages of $782,667. To this number, the court added attorney fees, expenses, and costs of $600,960 for a total award against My Pillow of $1,383,627.

¶ 28    Of that amount, relator received $266,891 in damages (30% of the proceeds of the action, or $889,637) and attorney fees in the amount of $600,960.

¶ 29                                    III. ANALYSIS
¶ 30                                 A. Standard of Review
¶ 31    After a bench trial, our standard of review is whether the order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. We also review an award of damages made after a bench trial under the manifest-weight standard. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. A trial court's judgment is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under the manifest-weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* Accordingly, we will not substitute our judgment for that of the trial court. *Id.* at 350-51.

¶ 32                                 B. Issues on Appeal
¶ 33    My Pillow raises several issues on appeal. First, My Pillow challenges the trial court's finding that My Pillow violated the Act, claiming that it could not possess the requisite *scienter* because the issue of whether My Pillow had an obligation to collect and remit tax on its Internet and telephone sales is a disputed legal issue. My Pillow next argues that the circuit court erred in calculating damages where it (1) trebled amounts paid prior to trial and (2) awarded relator damages for periods prior to its investigation. My Pillow additionally contends that the court erred in awarding attorney fees because relator is a *pro se* litigant who cannot recover its own attorney fees. My Pillow's final argument is that, because relator did not prevail on any claims related to craft shows, the trial court erred in awarding attorney fees for legal work related to craft shows.

¶ 34                    1. Whether My Pillow Acted With Reckless Disregard
¶ 35    We first address My Pillow's argument that it could not possess the requisite culpable state of mind of "knowingly" violating the Act because the underlying issue of whether My Pillow had an obligation to collect use taxes on its Internet and telephone sales was, itself, a disputed legal issue. To reiterate, section 3, relevant to this lawsuit, defines "knowingly" as acting "in

reckless disregard of the truth or falsity of the information." 740 ILCS 175/3(b)(1)(A)(iii) (West 2012).

¶ 36       My Pillow is referring to the constitutional requirement that before a state may impose a sales tax on an out-of-state company's sale within the state that company must have a "substantial nexus" with the state. See *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992); *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 421 (1996). My Pillow is arguing here that the initial question of whether My Pillow owed a duty to collect and remit use taxes in Illinois at all—whether a "substantial nexus" existed—is a disputed and complicated legal question, and thus, My Pillow could not possibly have acted with reckless disregard of its obligation to collect and pay sales taxes. The reasoning, in essence, is that one cannot recklessly disregard an obligation when it is debatable whether that obligation exists in the first instance.

¶ 37       We should clarify at the outset that My Pillow does not deny that it had a duty to collect and remit use taxes on the sales of its products in Illinois. That point was conceded. As we noted in the factual background, My Pillow began collecting and remitting use taxes in response to relator's lawsuit sometime in 2013 (and had intended to start in 2012). My Pillow's argument is that this liability was not sufficiently clear, during the relevant time period before it began to "voluntarily" collect and remit, for My Pillow to be found to have recklessly disregarded its tax obligations.

¶ 38       We do not quarrel with the proposition that the "substantial nexus" requirement is far from a clear requirement, especially in this digital age. We are instructed that the out-of-state vendor must have a "physical presence" in the taxing state. *Quill Corp.*, 504 U.S. at 317; *Brown's Furniture, Inc.*, 171 Ill. 2d at 423. But what, precisely, a "physical presence" means these days has proven difficult to pin down.

¶ 39       The " 'slightest' physical presence within a state will not establish substantial nexus." *Brown's Furniture, Inc.*, 171 Ill. 2d at 423 (quoting *Quill Corp.*, 504 U.S. at 315 n.8). On the other hand, the physical presence " 'need not be substantial.' " *Id.* at 424 (quoting *Orvis Co. v. Tax Appeals Tribunal*, 654 N.E.2d 954, 960-61 (N.Y. 1995)). Ultimately, "[l]eft unclear after *Quill* *** is the extent of physical presence in a state needed to establish more than a 'slight' physical presence." *Id.* at 423; accord *Relax the Back Corp.*, 2016 IL App (1st) 151580, ¶ 22 ("the law on what constitutes sufficient physical nexus to justify collection of the use tax is far from clear"). It is a decision to be made on a case-by-case basis. *Irwin Industrial Tool Co. v. Department of Revenue*, 394 Ill. App. 3d 1002, 1014 (2009), *aff'd*, 238 Ill. 2d 332 (2010).

¶ 40       If the only question were whether this is a nebulous area of the law, My Pillow would win the debate, hands down. But the question is more subtle. The question is not only whether, under the facts of a specific case, the existence of a sufficient nexus is difficult or simple, but also what the company did to try to figure out the answer to that question. After all, if we are to determine whether a company acted in "reckless disregard" of its obligation to collect and remit taxes, it stands to reason that our focus, at least in part, must be on that company's conduct. This court previously recognized that, given the murky nature of use-tax law in this context, a company is not *automatically* deemed to have "knowingly" violated the False Claims Act (then the Whistleblower Reward and Protection Act) by failing to collect and remit use taxes on its Illinois sales, but rather "necessary factual determinations *** must be made regarding defendants' knowledge" in each particular case. *Ritz Camera*, 377 Ill. App. 3d at 999.

¶ 41    Thus, though we agree with My Pillow that this area of use-tax law is imprecise, we must also consider My Pillow's conduct in this case before determining whether it acted in reckless disregard of its use-tax obligations in Illinois.

¶ 42    "Reckless disregard" under section 3 requires more than " '[i]nnocent mistakes or negligence.' " *State ex rel. Schad, Diamond & Shedden, P.C. v. National Business Furniture, LLC*, 2016 IL App (1st) 150526, ¶ 33 (quoting *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013)). It refers to "the failure ' "to make such inquiry as would be reasonable and prudent to conduct under the circumstances," ' " a " ' "limited duty to inquire as opposed to a burdensome obligation." ' " *Id.* (quoting *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 530 (6th Cir. 2012), quoting S. Rep. No. 99-345, at 20-21 (1986)).

¶ 43    "Reckless disregard" under section 3 has been aptly described as " 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.' " *Relax the Back Corp.*, 2016 IL App (1st) 151580, ¶ 27 (quoting *National Business Furniture*, 2016 IL App (1st) 150526, ¶ 33). "Thus, one acting in reckless disregard ignores 'obvious warning signs' and 'refus[es] to learn of information which [it], in the exercise of prudent judgment, should have discovered.' " *Id.* (quoting *United States ex rel. Ervin & Associates, Inc. v. Hamilton Securities Group, Inc.*, 370 F. Supp. 2d 18, 42 (D.D.C. 2005)).

¶ 44    For example, in *National Business Furniture*, 2016 IL App (1st) 150526, ¶ 7, the defendant was a Wisconsin company that sold furniture by phone, catalog, or the Internet and shipped its product to customers. Customers selected a shipping method, and a delivery charge was calculated at the completion of the purchase. *Id.* ¶ 8. The defendant did not collect and remit use tax on the shipping charges, but the relator (the same one as in this case) alleged that the defendant was in violation of Illinois law. *Id.* ¶¶ 10-11.

¶ 45    The evidence at trial showed that the defendant collected and remitted taxes on shipping charges in some states but not others, depending on the defendant's interpretation of the applicable state's laws and regulations, and that the defendant interpreted Illinois's administrative rule as not requiring the tax's imposition. *Id.* ¶¶ 13-14. The defendant subscribed to a publication that tracked changes in sales tax rules by state and used software that did the same. *Id.* ¶¶ 15-16. In addition, the Illinois Department of Revenue (IDOR) had conducted an "Illinois Sales Tax audit" for a one-year period, and the defendant opened up its books to IDOR. *Id.* ¶ 18. Those records included a document plainly showing that the defendant was collecting the use tax on the sale of merchandise but not on shipping. *Id.* ¶ 21. The former chief financial officer testified that he believed, at all relevant times, that the company was complying with Illinois tax laws. *Id.* ¶ 22.

¶ 46    At the close of trial, the circuit court found that the relator had failed to prove that the defendant acted with reckless disregard, that instead the defendant had reasonably relied on the IDOR audit and its own interpretation of the applicable Illinois administrative rule to determine that it owed no duty to collect use tax on shipping charges in Illinois. *Id.* ¶ 23. We affirmed, finding that the trial judge's findings were not against the manifest weight of the evidence. *Id.* ¶¶ 37-39. We reasoned that the relator failed to "prove that defendant ignored obvious warning signs, buried its head in the sand, and refused to learn information from which its duty to pay money to the State would have been obvious." *Id.* ¶ 39.

¶ 47    In *Relax the Back*, 2016 IL App (1st) 151580, ¶¶ 6-7, another recent case involving the same relator, the question was whether the defendant was liable for failing to collect and remit

use taxes for catalog and Internet sales for its neck and back care products (chairs, massage products, books, and videos). The claim regarding Internet sales was rejected because the trial court determined that no use taxes were owed in the first instance due to a lack of sufficient nexus. *Id.* ¶ 13. But as to catalog sales, the trial court found a sufficient nexus to impose tax liability, based on evidence that defendant's franchises in Illinois distributed 1000 catalogs to customers in Illinois every year. *Id.* Thus, as to catalog sales, the trial court proceeded to the question relevant here, whether the defendant recklessly disregarded its obligation to collect and remit those use taxes. *Id.*

¶ 48    The evidence showed that the defendant's chief financial officer (CFO) consulted with an outside tax attorney, who concluded that the defendant lacked a sufficient nexus to Illinois and owed no duty to collect and remit use taxes. *Id.* ¶ 8. The CFO likewise consulted with a "sales tax specialist in accounting" who reached the same conclusion. *Id.* ¶ 9. The CFO testified that outside certified public accountants audited the defendant's financial statements annually, and he understood that they would not have approved the financial statements had they believed the company should be collecting use taxes. *Id.* ¶ 10. Finally, the defendants presented an opinion witness, a former bureau manager of the audit bureau of IDOR, who testified that the defendant's investigation of its Illinois tax obligations was reasonable. *Id.* ¶ 11.

¶ 49    The trial court found that the defendant's CFO " 'made an honest effort to determine whether or not any tax liability occurred as a result of its *Internet* operations.' " (Emphasis added.) *Id.* ¶ 13. The trial court noted, however, that the defendant's investigation of its tax liability concluded in 2004 or 2005 and that its new requirement to Illinois franchises to mail catalogs to Illinois residents (the act that gave it a "substantial nexus" and triggered its use-tax obligation) began in either 2005 or 2006. *Id.* ¶¶ 14-15. Thus, because the defendant failed to reexamine its potential tax liability regarding catalog sales after imposing that new "catalog requirement" on its Illinois stores, the trial court found that the defendant recklessly disregarded its use-tax obligation as to catalog sales and was liable under the False Claims Act. *Id.* ¶¶ 15-16.

¶ 50    This court reversed the judgment in the relator's favor on the catalog sales. *Id.* ¶ 30. We reasoned that a mistaken interpretation of a somewhat gray area of the law was not reckless disregard. *Id.* Though we acknowledged that the defendant "did not actively seek the opinion of the IDOR or reevaluate [its] use tax obligation in light of its catalog requirement, this failure to ensure that [defendant] had no duty to collect Illinois use tax [was] not evidence of reckless disregard." *Id.*

¶ 51    A comparison of the facts in those cases, versus the facts here, shows the weakness of My Pillow's position. In *National Business Furniture*, 2016 IL App (1st) 150526, ¶¶ 13-22, the evidence showed that the defendant company investigated its potential tax liability under Illinois law in many ways, including attempts to remain updated on any changes in the law and surviving an audit from the State, and that instead of flatly denying tax liability throughout the country, the defendant actually conducted distinct, state-by-state analyses of its obligations, sometimes concluding that it owed a use-tax obligation and sometimes not.

¶ 52    And in *Relax the Back*, 2016 IL App (1st) 151580, ¶¶ 8-13, the defendant relied on legal and sales-tax accounting expertise in determining its lack of Illinois use-tax liability, an expert at trial opined that its efforts in doing so were reasonable, and even the trial court found that the defendant had made an honest effort, at least initially, to determine its use-tax liability under Illinois law, even if it failed to reconsider that liability after imposing the new "catalog

requirement." Indeed, in *Relax the Back*, the defendant continued to deny at trial that it owed a use-tax obligation in the first place, prevailing on that argument as to Internet sales, though losing as to catalog sales. *Id.* ¶¶ 13-15.

¶ 53    In stark contrast, in the matter before us, the trial court found that the evidence showed that My Pillow did not make a reasonable and prudent inquiry as to its tax obligations on Internet and telephone sales to Illinois customers. As the trial court explained, "Lindell testified that My Pillow did not review Illinois statutes or regulations regarding tax collection on Internet or telephone sales; did not review [the] IDOR website or IDOR publications and General Information letters posted on the website; did not review any case law; and never sought advice from IDOR."

¶ 54    The trial court also noted that "no one" at My Pillow did these things "even though My Pillow was participating at craft shows in Illinois and was selling products over the Internet and through phone sales to Illinois customers." The court noted that My Pillow paid its marketing company approximately $200,000 to nationally advertise its products but made no investment whatsoever in researching its tax obligations nor did it hire any lawyers or accountants.

¶ 55    The trial court further noted that My Pillow registered with IDOR in July 2012 and began filing Form ST-1s, which required it to report "[s]ales from locations outside of Illinois." But, as the trial court found, "[e]ven though the ST-1s clearly informed My Pillow that its Internet and telephone sales were taxable, My Pillow did no investigation and did not consult with any professional whether Internet and telephone sales were taxable."

¶ 56    The trial court noted that "Lindell testified that he thought he spoke to his accountant about tax collection but could not recall the meeting." The court found that Lindell was "not credible" when he testified that he did not act with reckless disregard. "Based on all the evidence," the court found that My Pillow knowingly violated the Act because it recklessly disregarded its obligation to collect and remit use taxes on Internet and telephone sales in Illinois.

¶ 57    We would also note that, after being served with relator's second amended complaint, My Pillow's response was not to hold firm to some good-faith conclusion that it had no tax obligations—rather, My Pillow's CEO immediately instructed an employee to begin collecting the tax, which it eventually began to do in 2013, amending its tax submissions to the State and paying the past-due tax. A rational fact finder might find it difficult to believe that My Pillow had engaged in a reasonable, thoughtful analysis of its use-tax liability in Illinois when it folded so quickly in the face of accusations that it had failed to pay the tax.

¶ 58    Having reviewed the record at trial and the trial court's careful, well-reasoned ruling, we cannot say that the trial court's findings are against the manifest weight of the evidence. We cannot say that the opposite conclusion is clearly evident or that the finding is arbitrary or not based on the evidence presented. See *Best*, 223 Ill. 2d at 350.

¶ 59    While My Pillow may be correct that its tax liability under Illinois law was less than clear, the trial court found that it did nothing to try to comb through the thicket to make a reasonable judgment about its tax obligations. That is the fatal blow for My Pillow, the fact that distinguishes this case from the others discussed. In those other cases, the companies undertook investigations and came to reasonable conclusions, and they could not be held liable under the False Claims Act for what amounted to nothing more than reasonable differences in legal opinions. My Pillow cannot altogether ignore any possible tax liability under Illinois law

and then, when called to account for it, claim that it was too confusing to determine, so it never should have had to try to figure it out in the first place.

¶ 60 In a case under the federal False Claims Act brought to our attention by relator, a New York federal court said this:

"It is true that FCA liability cannot attach where an incorrect submission results simply from a misunderstanding concerning what the applicable regulations require of a claimant. The record demonstrates, however, that this is not what happened here. While confusion apparently existed on the margins concerning the precise requirements of the new cost-reporting instructions *** *the [defendants] have not pointed to any evidence that they tried to comply with the new regulations, and somehow blundered in the attempt. Nor do the [defendants] claim at any point that they were confused by the new instructions.* Instead, the [defendants] attempt to hide behind the general 'abundance of confusion and misdirection' that they contend surrounded the issuance of [the new cost-reporting instructions] to argue, in effect, that the dispute over the meaning and validity of [the new cost-reporting instructions] created blanket immunity for everyone ordered to comply with the new interpretation." (Emphasis added.) *Visiting Nurse Ass'n of Brooklyn v. Thompson*, 378 F. Supp. 2d 75, 95 (E.D.N.Y. 2004).

¶ 61 That passage appropriately describes My Pillow's argument and the correct response. If My Pillow is correct that the murky nature of this area of use-tax law is enough, by itself, to avoid liability under the "knowing"/reckless-conduct standard of section 3, then in effect we would be writing section 3 out of existence, at least as it concerns reverse false claims of use-tax liability in interstate commerce. It would make no difference whether a company engaged in a reasonable, thoughtful inquiry as to its use-tax obligations or brazenly ignored any potential liability—all that would matter is that the question is a thorny one, subject to good-faith dispute, and thus, as a matter of law no reckless conduct occurred.

¶ 62 My Pillow did not demonstrate that it *had* a good-faith dispute over its use-tax obligations in Illinois because it never made any reasonable effort to determine that obligation one way or the other. The trial court found that My Pillow's conduct was far removed from a reasonable, prudent inquiry into its use-tax obligations under Illinois law and was much more akin to burying its head in the sand and ignoring obvious warning signs. We cannot say that these findings were against the manifest weight of the evidence. We affirm the trial court's judgment on liability.

¶ 63                                                   2. Damages

¶ 64 My Pillow next challenges the trial court's damages award. A person who violates the Act "is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person." 740 ILCS 175/3(a)(1) (West 2012). My Pillow claims that the trial court erroneously trebled the amount that My Pillow remitted prior to trial ($106,970) when it filed its amended Form ST-1s for 2012 and 2013. My Pillow also challenges the trial court's decision to award relator damages (and penalties) for the period prior to its investigation, which began on August 30, 2011. We first address the "trebling" issue.

¶ 65                                                 a. Trebling of $106,970 Paid Before Trial

¶ 66      The first issue concerns the $106,970 that My Pillow paid in taxes to the State before trial. Everyone agrees that My Pillow is entitled to some form of credit against the judgment for the $106,970 it paid before trial. But the question is whether that money should be included in the amount of "damages" that are trebled, and *then* credited (as relator argues), or whether it should be deducted *before* trebling (as My Pillow argues).

¶ 67      The trial court ruled one way and then reversed itself, so a brief review of the relevant procedural history and the trial court's reasoning is in order.

¶ 68      After trial, relator filed a memorandum requesting an award of $1,008,167 ($557,167 in damages and $451,000 in penalties). In support of its request for $557,167 in damages, relator claimed that My Pillow's unpaid tax liability for the period of June 2010 through October 31, 2013, was $221,379. This amount included the $106,970 tax liability that My Pillow had remitted prior to trial. Relator argued that My Pillow's untimely compensatory payments should not be subtracted until after the damages were trebled and claimed that the $221,379 amount had to be trebled under the Act (for a trebled total of $664,137). *After* trebling the damages, relator credited My Pillow for the $106,970, to arrive at the final figure of $557,167. In response, My Pillow claimed that its remittance of the $106,970 in taxes should be subtracted from the damages amount *prior* to trebling.

¶ 69      On February 18, 2015, the court entered its original order. The court agreed with My Pillow and concluded that the $106,970 that My Pillow remitted to the State in 2013 and 2014 should be subtracted from the damages prior to trebling. The court based its decision on the fact that My Pillow had timely filed the amended Form ST-1s, which it was allowed to do under ROTA.

¶ 70      On December 17, 2015, in its second amended final order and judgment, the court changed its decision and concluded that the $106,970 that My Pillow paid to the State must be included in the amount to be trebled and must be considered "proceeds" of this action. My Pillow would still get credit for the payment, but it would be deducted from the damages *after* trebling.

¶ 71      As the trial court explained, the evidence at trial was that, *after* being served with the second amended complaint filed by relator, Lindell instructed an employee to begin collecting the tax alleged in the complaint and that finally, in 2013, My Pillow began to collect the tax, amended its Form ST-1s, and paid the delinquent tax. Thus, in the court's view, "the $106,970 must be considered proceeds of this action because they were remitted after Relator sued [My Pillow] and in response to the suit and because they were produced or derived from Relator's Complaint." As the court further found: "It is clear from the evidence, in particular the testimony of [My Pillow]'s CEO [Lindell], that these past due taxes would not have been paid to the State had Relator not brought this action."

¶ 72      The court further noted that "damages" under the Act are what the State sustained because of My Pillow's acts. The court found that My Pillow "did not pay this tax until it was sued by Relator; thus, the State was deprived of it. Those are the damages." The court ordered that "the $106,970 is considered damages which should be included in the amount which is to be trebled."

¶ 73      The trial court found, and My Pillow does not dispute, that "these past due taxes would not have been paid to the State had Relator not brought this action." The fact that the amendments to the Form ST-1s were allowed under ROTA was not the decisive consideration. The relevant

consideration, the trial court reasoned, was the fact that My Pillow made those amendments and paid the $106,970 in past due taxes as a direct result of this lawsuit.

¶ 74    My Pillow argues that the court's initial ruling was correct and that relator cannot treble the $106,970 that My Pillow paid with its amended Form ST-1s for 2012 and 2013. For the reasons that follow, we disagree with My Pillow.

¶ 75    We begin with the analysis by the United States Supreme Court, considering the federal false claims statute, in *United States v. Bornstein*, 423 U.S. 303 (1976). In *Bornstein*, the federal government filed an action against a subcontractor that had knowingly provided falsely-marked products to the prime contractor, which resulted in the prime contractor presenting false claims to the government. After the government discovered the fraud, the prime contractor made payments to the government. *Id.* at 307. But the government sued the subcontractor under the federal False Claims Act and sought, among other things, double damages (before the statute was amended to provide for treble damages). The subcontractor argued that, before determining the amount of "damages" that should be doubled, any earlier compensatory payments should be deducted. The Supreme Court disagreed, holding that "the [g]overnment's damages should be doubled before any compensatory payments are deducted, because that method of computation most faithfully conforms to the language and purpose of the [federal act]." *Id.* at 314.

¶ 76    The Court first noted that the federal act "speaks of doubling 'damages' and not doubling 'net damages' or 'uncompensated damages.' " *Id.* at 314 n.10. It further reasoned that the "make-whole purpose of the Act is best served by doubling the Government's damages before any compensatory payments are deducted." *Id.* at 315. The Court gave a detailed discussion of those reasons:

> "First, this method of computation comports with the congressional judgment that double damages are necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims. Second, the rule that damages should be doubled prior to any deductions fixes the liability of the defrauder without reference to the adventitious actions of other persons. The position [advanced by the subcontractor] would mean that two subcontractors who committed similar acts and caused similar damage could be subjected to widely disparate penalties depending upon whether and to what extent their prime contractors had paid the Government in settlement of the Government's claims against them. *** [T]he prime contractor's fortuitous acts should not determine the liability of the subcontractor under the [treble]-damages provision. *Third, the reasoning [advocated by the subcontractor] would enable the subcontractor to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time prior to judgment. This possibility would make the double-damages provision meaningless.* Doubling the Government's actual damages before any deduction is made for payments previously received *from any source* in mitigation of those damages forecloses such a result." (Emphases added.) *Id.* at 315-16.

¶ 77    Based on *Bornstein*, the trial court correctly found that the amount of use tax My Pillow remitted to the State prior to trial—the amount of $106,970—should not be deducted before trebling, but should be credited after trebling. First, the Supreme Court noted that the federal act in effect at the time referred to "doubling 'damages' and not doubling 'net damages' or 'uncompensated damages' " (*id.* at 314 n.10), and the same may be said of our state Act. The

federal act at the time provided for "double the amount of damages which the United States may have sustained by reason of the doing or committing such act" of submitting a false claim. (Internal quotation marks omitted.) *Id.* at 305 n.1. Section 3 of our Act provides for penalties for violations "plus 3 times the amount of damages which the State sustains because of the act of that person" submitting the false claim. 740 ILCS 175/3(a)(1) (West 2012). In substance, these provisions are identical.

¶ 78    Moreover, as *Bornstein* aptly noted, were it otherwise, a strategic defendant could render the treble-damages provision meaningless with a preemptive, prejudgment payment of the original amount sought. See *Bornstein*, 423 U.S. at 316. A defendant, fearing an adverse judgment on a False Claim Act count, could wait months or years—or in some cases, until the eve of a final trial judgment—then pay the entire nontrebled amount of damages sought by the relator or the government and claim that there was nothing left to treble. Admittedly, that is not precisely what happened here, but something very close to it did—the trial court specifically found that the $106,970 My Pillow remitted the State was in direct response to the relator's lawsuit.

¶ 79    Similar reasoning has been applied by one court, in a different context. In *McGinty v. New York*, 193 F.3d 64 (2d Cir. 1999), plaintiffs sued several defendants, including the State of New York, for wrongfully reducing death or disability benefits based on age, in violation of the federal Age Discrimination in Employment Act (ADEA) (29 U.S.C. §§ 621-634 (1994)). In an attempt to bring the state in compliance with the ADEA, the state later made additional death benefit payments to plaintiffs. *McGinty*, 193 F.3d. at 67-68. But the court rejected the defendants' claim that the plaintiffs' death benefit claims were moot. *Id.* at 70-71. The court stated: "[P]laintiffs here unquestionably suffered actual damages at the time that defendants willfully paid them less in death benefits than ADEA required upon the deaths of their decedents." *Id.* at 71. As the court further explained: "If defendants were correct that plaintiffs' consequent statutory right to liquidated damages could be wiped out by defendants' later preemptive distribution of the willfully-caused deficit in those death benefits, any ADEA defendant could violate the law with impunity, then avoid its statutory obligation to pay liquidated damages simply by paying off plaintiffs' compensatory damages claims before resolution of the suit." *Id.* Citing *Bornstein*, the court in *McGinty* concluded: "That cannot be and is not the law." *Id.*

¶ 80    My Pillow relies on *United States v. Anchor Mortgage Corp.*, 711 F.3d 745 (7th Cir. 2012), which it claims "requires" that the tax payments that My Pillow made prior to trial be deducted from the amount of damages prior to trebling. In *Anchor Mortgage*, the defendants, a mortgage brokerage corporation and its former president, fraudulently obtained 11 federally guaranteed home mortgage loans secured by real property by submitting false certifications with the loan applications (falsely stating that relatives had provided the down payments for the loans and that Anchor Mortgage had not paid anyone for referrals). *Id.* at 747. Before trebling the amount of damages sustained by the government, the court considered what those damages actually were. *Id.* at 748. The government, as the guarantor of those loans, had paid money to the lenders to compensate them, but later had sold the land securing the loans to recoup some of the loss. The district court took the amount the government had paid to the lenders, trebled it, and then deducted the sales proceeds as a credit against the trebled damages award. *Id.* at 746.

¶ 81    The Seventh Circuit reversed, holding that the sales proceeds should have first been deducted before trebling—what it called "net trebling." *Id.* at 750-51. As the court reasoned:

"Basing damages on net loss is the norm in civil litigation. If goods delivered under a contract are not as promised, damages are the difference between the contract price and the value of what arrives. If the buyer has no use for them, they must be sold in the market in order to establish that value. If instead the seller fails to deliver, the buyer must cover in the market; damages are the difference between the contract price and the price of cover. If a football team fires its coach before the contract's term ends, damages are the difference between the promised salary and what the coach makes in some other job (or what the coach could have made, had he sought suitable work). Mitigation of damages is almost universal." *Id.* at 749.

¶ 82    My Pillow contends that this "benefit of the bargain" approach applies to the instant case involving My Pillow's failure to pay sales taxes that were due. We disagree. It may be true that "[i]n most [federal False Claims Act] cases, damages are measured as they would be in a run-of-the-mine breach-of-contract case—using a 'benefit-of-the-bargain' calculation in which a determination is made of the difference between the value that the government received and the amount that it paid." *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 87 (2d Cir. 2012).

¶ 83    But this is not the typical false-claims case involving the provision of goods to the government that were worth less than what the government thought it was getting. As we mentioned at the outset, this case presents what is known as a "reverse false claim, where a material misrepresentation is made to avoid paying money owed to the government." *Relax the Back*, 2016 IL App (1st) 151580, ¶ 19. As we have noted, "[t]he reverse false claims provision was added to provide that an individual who makes a material misrepresentation to avoid paying money owed to the Government would be equally liable under the Act as if he had submitted a false claim to receive money." (Internal quotation marks omitted.) *Ritz Camera*, 377 Ill. App. 3d at 996.

¶ 84    My Pillow did not breach a contract. There was no "bargain" or contract in the instant case. My Pillow simply failed to pay taxes it owed—*i.e.*, it "knowingly conceal[ed] or knowingly and improperly avoid[ed] *** an obligation to pay or transmit money *** to the State." 740 ILCS 175/3(a)(1)(G) (West 2012).

¶ 85    *Anchor Mortgage* was a typical false-claims case, where the defendant submitted false documents to procure government-backed mortgages. *Anchor Mortgage*, 711 F.3d at 747. Its holding was grounded, as the court noted, in the contractual concept of "[m]itigation of damages" (*id.* at 749), the notion that if a bad product is delivered, the government should not get *all* of its money back, but rather it must first determine the worth of what it did receive and subtract that from the amount it paid. *Id.* ("If goods delivered under a contract are not as promised, damages are the difference between the contract price and the value of what arrives."). It is difficult to fit that concept into this reverse false claim, where My Pillow did not "mitigate" its damages in any reasonable meaning of that phrase. All it did was prepay some of the damages. It should get a credit on the back end—as it did—but only after its inclusion in the amount of damages that were trebled. Otherwise, as the trial court correctly noted, My Pillow would be "reward[ed] for [a] payment made only because My Pillow was found out and sued."

¶ 86    *Bornstein* clearly holds that if a wrongdoer is caught in an act of submitting a false claim, the prepayment of some of the damages should not be deducted from the damages that are doubled (now trebled). *Bornstein*, 423 U.S. at 316. That is precisely what happened here. My

Pillow started remitting taxes only after relator sued it for failing to do so. It was a preemptive, partial payment of the State's actual damages. If we allowed that to serve as a credit against the damages award *before* being trebled, we would render the treble-damages provision meaningless. See *id.*

¶ 87    We agree with the trial court that, at the time My Pillow failed to pay the sales tax it owed, the State was deprived of the sales tax My Pillow owed to Illinois on Internet and telephone sales for 2012 ($61,218) and 2013 ($45,752); thus the State sustained damages totaling $106,970. Those were actual damages. We agree with the trial court's conclusion that, although My Pillow is entitled to a credit for the $106,970 that it paid before judgment, that credit must come after the damages—including that $106,970—are trebled. We affirm the award of damages on this question.

¶ 88                    b. Damages for Periods Prior to Relator's Investigation

¶ 89    It is undisputed that My Pillow failed to collect tax on Internet and telephone sales beginning in June 2010. Relator claimed it was entitled to damages for 41 months (June 2010 to October 2013). But My Pillow argues that relator was not entitled to any damages for the period prior to relator's investigation, which began on August 30, 2011. My Pillow claims that "[n]o facts are alleged in the Third Amended Complaint regarding a violation of the Act for earlier time periods" than August 30, 2011. Thus, My Pillow argues, relator is not entitled to any damages for false claims that occurred prior to August 30, 2011.

¶ 90    If we are to take this argument literally, My Pillow's argument that "[n]o facts are alleged in the Third Amended Complaint regarding a violation of the Act for earlier time periods" than August 30, 2011, sounds like an argument in a motion to dismiss a complaint for lack of sufficient fact-pleading. See 735 ILCS 5/2-615 (West 2010). But as relator notes, My Pillow answered that complaint and thus waived any objection to insufficient factual pleading. See 735 ILCS 5/2-612(c) (West 2010) ("All defects in pleadings, either in form or substance, not objected to in the trial court are waived."); see *Fox v. Heimann*, 375 Ill. App. 3d 35, 41 (2007) (defendant's answer to complaint waived any defect in pleading).

¶ 91    And regardless of how insufficient the factual pleading may have been, it would have been cured under the doctrine of aider by verdict. Under that doctrine, "where a defendant allows an action to proceed to verdict, that verdict will cure not only all formal and purely technical defects and clerical errors in a complaint, but will also cure any defect in failing to allege or in alleging defectively or imperfectly any substantial facts which are essential to a right of action." (Internal quotation marks omitted.) *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 60-61 (1994); see also *Swager v. Couri*, 77 Ill. 2d 173, 185 (1979); *Fox*, 375 Ill. App. 3d at 41. This case went to final judgment before the bench, and the court found that the evidence established that My Pillow's failure to collect and remit use taxes reached back to June 2010. That judgment cured any deficiency, if one existed in the first place, in the third amended complaint.

¶ 92    Another way to read this argument, conceivably, is that My Pillow is claiming surprise at trial that relator was seeking damages for actions that predated August 30, 2011, which prejudiced its ability to defend the case. If that is what My Pillow means, it has not said so or even hinted as much. Absent citation to prevailing law or any development of that argument, My Pillow has forfeited the argument. *Old Second National Bank v. Indiana Insurance Co.*, 2015 IL App (1st) 140265, ¶ 35 (failure to cite legal authority results in forfeiture of issue on appeal). Regardless, our review of the third amended complaint reveals that relator alleged the

following with regard to My Pillow's obligation to collect and remit use tax on its Internet and phone sales:

> (1) "My Pillow did not begin to collect and remit tax on Website and telephone sales until at least July or possibly September, 2013."
>
> (2) "My Pillow is liable for making false claims under the Act for six years prior to the filing of the initial complaint on July 13, 2012. \*\*\* My Pillow is liable under the Act as amended July 27, 2010 because it knowingly concealed or knowingly and improperly avoided an obligation to pay money to the State."
>
> (3) "Beginning July 27, 2010, My Pillow knowingly concealed or knowingly and improperly avoided or decreased its obligation to pay money to the State by failing to collect and remit sales tax on its Website and infomercial sales to Illinois purchasers."
>
> (4) "The limitations period under the Act is six years. My Pillow is liable for making false claims as defined in the False Claims Act for a period of six years prior to the filing of the initial complaint on July 13, 2012."
>
> (5) "From January 2010 through July 2013, the date My Pillow, Inc. began to collect and remit tax on Website and telephone sales, each failure to maintain records showing the tax owed constitutes a separate violation for which a mandatory individual penalty will be assessed."

¶ 93    It is not credible to believe, from reading these allegations, that My Pillow was unaware that relator would be seeking damages predating August 30, 2011.

¶ 94    Finally, to the extent that My Pillow is raising a *legal* argument here—that, as a matter of law, relator could not have recovered for any actions that predate the commencement of relator's investigation on August 30, 2011—that argument is both forfeited and without merit. Forfeited, because My Pillow has pointed to no language in the Act, or to any case law, that would suggest that a company that fails to collect and remit use taxes to the State cannot be held liable for that conduct until the fortuitous moment that either a relator or the State begins to inquire into the matter. See *Old Second National Bank*, 2015 IL App (1st) 140265, ¶ 35 (failure to develop argument or cite to pertinent authority constitutes forfeiture of argument on appeal).

¶ 95    And without merit, because it would be a perverse interpretation of the Act, indeed, to suggest that a company has blanket immunity under the Act to avoid collecting and remitting use taxes until someone begins to realize what the company has been up to. The remedy for a violation of the Act, besides penalties and fee awards, is an award for "damages which the State sustains because of the act of" the wrongdoer. 740 ILCS 175/3(a)(1) (West 2012). That language is unconcerned with when the State, much less a relator, first got wind of the problem. Here, the evidence showed that the "damages which the State sustain[ed] because of the act[s] of" My Pillow went back to June 2010. Relator thus proved its case for damages going back to that date. The date on which relator began its investigation or discovered the problem is irrelevant.

¶ 96    That is not to say that a wrongdoer's liability can extend back into time indefinitely. It cannot. The Act provides a limitations period for civil actions, generally limiting actions to six years from the date on which the violation was committed. 740 ILCS 175/5(b)(1) (West 2012). *That* is the protection afforded to a company that fails to collect and remit use taxes—the knowledge that the State cannot go back more than six years from the filing of the

complaint—not some unwritten, judicially-bestowed immunity that allows a company to avoid its tax obligations with impunity until the day it is caught.

¶ 97    The evidence showed that, by My Pillow's own admission, My Pillow did not remit tax on Internet and telephone sales from June 2010 through July 2013. The trial court properly assessed damages relating back to the relevant date of June 2010. We affirm the damages award.

¶ 98                                        3. Attorney Fees
¶ 99                    a. Relator's Entitlement to Attorney Fees for Work of Its Own Lawyers
¶ 100   My Pillow next argues that the trial court erred in awarding attorney fees to relator, a law firm, because a plaintiff who is also an attorney cannot recover his or her own attorney fees.[2]

¶ 101   We first address our standard of review. Under Illinois law, a trial court cannot award attorney fees to a party unless the fees are specifically authorized by statute or by contract between the parties. *Grate v. Grzetich*, 373 Ill. App. 3d 228, 231 (2007). Generally, where the trial court has the authority to award attorney fees, we review its decision to award attorney fees for an abuse of discretion. *Id.* But whether a trial court has the *authority* to grant attorney fees as an available remedy is a question of law that we review *de novo*. *Id.*; accord *Spencer v. Di Cola*, 2014 IL App (1st) 121585, ¶ 35. My Pillow is challenging the trial court's authority to award fees under the Act to a relator who is both the litigant and an attorney. So our review is *de novo*.

¶ 102   The Act provides that, when the State does not intervene in a false claims action, the person who brings the action:

> "shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25% and not more than 30% of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." 740 ILCS 175/4(d)(2) (West 2012).

¶ 103   The plain language of section 4(d)(2) does not explicitly preclude an award of attorney fees to a law firm that was both the relator and the law firm representing the relator. No reported Illinois decision has addressed this topic under the Act. Nor, as far as both this court and the parties could determine, has any decision, anywhere in the country, discussed whether a relator-law firm can obtain attorney fees under a false-claim statute for work performed representing itself in the litigation. Neither party has pointed to any illuminating legislative history on this question, and we have found none, either.

¶ 104   The parties have cited case law concerning two areas of the law—case law involving an *individual* attorney's attempt to collect attorney fees when that lawyer represents himself *pro se* in a proceeding and case law concerning a plaintiff-*law firm*'s ability to collect fees for work performed by its member lawyers in representing the firm in court. Neither of these are perfect analogies, particularly because none of them concern a fee-shifting provision under a

---

[2]My Pillow does not contest the attorney fees awarded for services performed by another law firm that was hired by relator.

- 17 -

state or federal false-claims statute, but these decisions are helpful in analyzing this difficult question.

¶ 105                    i. Individual Plaintiff-Attorney's Entitlement to Fees for Self-Representation

¶ 106      In *Hamer v. Lentz*, 132 Ill. 2d 49, 63 (1989), the Illinois Supreme Court held that an attorney proceeding *pro se* in an action brought pursuant to the Illinois Freedom of Information Act (FOIA) (Ill. Rev. Stat. 1987, ch. 116, ¶ 201 *et seq.*) was not entitled to fees under that statute. The FOIA, like the Act in this case, contained a standard fee-shifting provision that did not speak to the question. The court based its decision on three grounds.

¶ 107      First, the court explained that the purpose of the fee provision was to ensure enforcement of the FOIA by "removing the burden of legal fees, which might deter litigants from pursuing legitimate FOIA actions." *Hamer*, 132 Ill. 2d at 62. But "[a] lawyer representing himself or herself simply does not incur legal fees," so the specter of having to pay an attorney did "not present a barrier" to the *pro se* lawyer, as it would to a nonlawyer plaintiff. *Id.*

¶ 108      Second, the court reasoned that another purpose of the fee-shifting provision was to "avoid unnecessary litigation by encouraging citizens to seek legal advice before filing suit." *Id.* The presence of an independent lawyer brought a detached, second set of eyes on the facts and the law, even if the plaintiff was already a lawyer himself or herself. *Id.*

¶ 109      Third, the court feared the potential for abusive fee generation if a lawyer were permitted to represent himself or herself *pro se* and then collect fees for the self-representation. FOIA actions, in other words, could become less about vindicating citizen requests for information from the government and more about a vehicle to generate legal fees. Though the court in *Hamer* had no indication that the plaintiff was engaged in such a practice, or that he had an otherwise "inactive practice," the court did not "think it advisable to leave the door open for unscrupulous attorneys." *Id.*

¶ 110      Appellate courts have applied the holding in *Hamer* in contexts beyond the FOIA, denying attorney fees to individual attorneys representing themselves in litigation. See, *e.g.*, *Kehoe v. Saltarelli*, 337 Ill. App. 3d 669, 677-78 (2003) (individual lawyer not entitled to fees for self-representation in malpractice action); *In re Marriage of Pitulla*, 202 Ill. App. 3d 103, 117-18 (1990) (individual attorney representing self in dissolution-of-marriage action not entitled to recover attorney fees).

¶ 111      Two years after our supreme court decided *Hamer*, the United States Supreme Court weighed in on this topic in *Kay v. Ehrler*, 499 U.S. 432 (1991), holding that a *pro se* attorney was not entitled to recover attorney fees under 42 U.S.C. § 1988 (1988), a federal civil-rights statute. As the Court noted:

> "A rule that authorizes awards of counsel fees to *pro se* litigants—even if limited to those who are members of the bar—would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case." *Kay*, 499 U.S. at 438.

¶ 112      *Kay*, then, simply reinforced what our supreme court had cited as its second basis for denying fees to *pro se* lawyers under the Illinois FOIA—that the law should encourage even lawyer-plaintiffs to retain independent counsel, who can provide an objective perspective to

- 18 -

both weed out non-meritorious claims and more effectively prosecute meritorious ones. See *Hamer*, 132 Ill. 2d at 62.

¶ 113                 ii. Plaintiff-Law Firm's Entitlement to Fees for Self-Representation

¶ 114      Though the United States Supreme Court's decision in *Kay* was limited to holding that an individual plaintiff-attorney could not collect fees for self-representation under a fee provision in a civil-rights statute, the United States Supreme Court dropped a footnote in response to the suggestion that Congress had intended to compensate *organizational* plaintiffs that represent themselves for the legal work they performed:

> "Petitioner argues that because Congress intended organizations to receive an attorney's fee even when they represented themselves, an individual attorney should also be permitted to receive an attorney's fee even when he represents himself. However, an organization is not comparable to a *pro se* litigant because the organization is always represented by counsel, whether in-house or *pro bono*, and thus, there is always an attorney-client relationship." *Kay*, 499 U.S. at 436 n.7.

¶ 115      Thus, though this footnote was not directly central to the Supreme Court's holding, the Court clearly signaled that organizational plaintiffs would stand on different ground than individual plaintiffs engaged in self-representation. The existence of an attorney-client relationship between the organization and its lawyer, even if that lawyer were an employee of that organization, apparently satisfied the Court's concern about the need for objective counsel.

¶ 116      When one thinks of the Supreme Court's reference to "organizations" that "represent[ ] themselves" through "in-house or *pro bono*" lawyers (*id.*), included within that category would be obvious examples of nonprofit organizations devoted to public-policy issues such as protection of the environment, fair-housing practices, or the like. See, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992) ("organizations dedicated to wildlife conservation and other environmental causes"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982) (nonprofit corporation whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area" (internal quotation marks omitted)); *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 252 (1994) ("national nonprofit organization that supports the legal availability of abortion").

¶ 117      Does it also include law firms, who are party-plaintiffs and whose member attorneys represent the firm in court? Several federal circuit courts of appeals have considered this question and have unanimously answered: "Yes."

¶ 118      These courts, relying heavily on this footnote in *Kay*, have held that a prevailing plaintiff-law firm *may* collect attorney fees for the work performed by its member lawyers under a statutory fee-shifting provision—that a law firm is one of the "organizations" referenced in the *Kay* footnote. See, *e.g.*, *Gold, Weems, Bruser, Sues & Rundell v. Metal Sales Manufacturing Corp.*, 236 F.3d 214, 218-19 (5th Cir. 2000) ("when an organization is represented by an attorney employed by the organization, the attorney has a status separate from the client," and thus, plaintiff law firm could collect attorney fees under Louisiana statute for work performed by member lawyers on plaintiff law firm's behalf); *Bond v. Blum*, 317 F.3d 385, 400 (4th Cir. 2003) (appellate court allowed fees to plaintiff law firm for work of its member lawyers in copyright lawsuit, because "[w]hen a member of an entity who is also an attorney represents the entity, he is in an attorney-client relationship with the entity and, even

though interested in the affairs of the entity, he would not be so emotionally involved in the issues of the case so as to distort the rationality and competence that comes from independent representation"), *abrogated on other grounds by Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. ___, 136 S. Ct. 1979 (2016).

¶ 119    Following these holdings in *Gold* and *Bond*, the D.C. Circuit Court of Appeals held that a plaintiff law firm could seek fees under the federal FOIA for work performed by its member lawyers. *Baker & Hofstetler LLP v. United States Department of Commerce*, 473 F.3d 312, 326 (D.C. Cir. 2006). The court reasoned that the *Kay* footnote had made a "crystal clear" distinction between organizational plaintiffs and individual plaintiffs (*id.* at 325), and it could find no "principled basis" to distinguish law firms from other organizational plaintiffs employing in-house counsel. *Id.* The court wrote that *Kay*'s footnote "suggests that an in-house counsel for a corporation is sufficiently independent to ensure effective prosecution of claims," and "[a]n attorney who works for a law firm certainly is no less independent." *Id.*

¶ 120    The Eighth Circuit relied on these three decisions (and the *Kay* footnote) to hold that a successful defendant-law firm in an action pursuant to the Employee Retirement Income Security Act (29 U.S.C. § 1001 *et seq.* (2006)) could recover legal fees for the work of its member associate. *Treasurer, Trustees of Drury Industries, Inc. Health Care Plan & Trust v. Goding*, 692 F.3d 888, 898 (8th Cir. 2012). The court found "no meaningful distinction between a law firm and any other organization on the issue of whether there exists an attorney-client relationship between the organization and its attorney." *Id.* Last year, the First Circuit agreed, holding that a successful defendant-law firm could recover attorney fees for the work performed by one of the law firm's salaried associates. *Fontanillas-Lopez v. Morell Bauzá Cartagena & Dapena, LLC*, 832 F.3d 50, 61 (1st Cir. 2016).

¶ 121    But My Pillow cites a recent decision of the Michigan Supreme Court that reached the opposite conclusion under that state's law. In *Fraser Trebilcock Davis & Dunlap PC v. Boyce Trust 2350*, 870 N.W.2d 494, 501 (Mich. 2015), the court denied a plaintiff-law firm fees for legal work its member attorneys performed in a suit to collect unpaid fees from a client. The court considered the *Kay* footnote to be "nonbinding dictum" and reasoned that, whatever else that footnote may have meant, it was not intended to "affirmatively distinguish an individual attorney-litigant from a law firm seeking fees for the representation it provided to itself through its member lawyers—a distinction we particularly hesitate to read into *Kay*'s footnote, given the overall thrust of the opinion." *Id.* Ultimately, the court saw no meaningful distinction between an individual lawyer's self-representation and a law firm's self-representation. *Id.*

¶ 122    While that holding supports My Pillow's position that relator should be denied fees, this passage in the court's opinion does not:

> "*Kay*'s footnote spoke to the attorney-client relationship that may arise between an organization and its in-house or pro bono counsel. Hoping to duck under *Kay*'s umbrella, Fraser Trebilcock likens the member lawyers who appeared on its behalf to such in-house counsel, but we find this characterization inapt. As *Kay*'s dictum reflects, *the relationship between an organization and its in-house counsel is typically one of attorney and singular client; the attorney is employed by the organization in order to provide legal services to the organization*. There is no indication, however, that Fraser Trebilcock enjoyed this same type of relationship with its member lawyers in the instant suit—namely, that these lawyers were employed by and affiliated with the firm to provide legal services to the firm as a distinct and exclusive client, rather

than to provide such services on behalf of the firm to its clients. Whether and under what circumstances a law firm may recover fees for representation provided to it by in-house counsel is not before us, and we decline to reach that question here." (Emphasis added.) *Id.*

¶ 123 This language is helpful to relator, as the record demonstrates that virtually all of relator's legal work consists of filing false-claims cases as a party-plaintiff. My Pillow does not dispute that fact and, in fact, has gone to great lengths to characterize relator as a professional relator, a characterization relator does not dispute (and which the record amply supports). Thus, while in *Fraser Trebilcock*, the law firm was a traditional law firm with an assortment of clients and that one-off collection case was an anomaly where the firm was representing itself, in this case relator's member lawyers routinely, and nearly exclusively, represent the firm—a singular client. Thus, relator could plausibly argue that the associates and shareholders of its law firm are more akin to "in-house" counsel, falling under *Kay*'s footnote, than they are a traditional law firm.

¶ 124 We now turn to Illinois law on this topic. This court recently considered whether a plaintiff-organization that provided legal services to prisoners could collect fees for the work performed by its in-house, salaried lawyers for the successful prosecution of a FOIA claim. *Uptown People's Law Center v. Department of Corrections*, 2014 IL App (1st) 130161. This court ruled that it could not. The court first noted that Uptown People's Law Center (Uptown), as a corporate entity, could not proceed *pro se* but, rather, was represented by two of its in-house lawyers, Mr. Mills and Ms. Schult. *Id.* ¶ 25. The court reasoned, however, that "the purpose of the attorney fee provision would not be furthered by awarding attorney fees in this instance" because, given that the lawyers were already salaried employees of Uptown:

"Uptown was not required to spend additional funds specifically for the purpose of pursuing FOIA requests. [Citation.] Thus, legal fees were never a burden that Uptown was required to overcome in order to pursue its FOIA requests. In addition, Mills and Schult had no expectation of receiving additional fees from Uptown for performing this work. [Citation.] As a result, providing Uptown with legal fees for pursuing FOIA requests would not compensate Uptown. On the contrary, an award of fees would reward Uptown. Moreover, it would encourage salaried employees working for a not-for-profit organization to engage in fee generation for the organization's behalf. Accordingly, we hold that the reasoning of *Hamer* prohibits a not-for-profit legal organization from being awarded legal fees [for work performed by its member lawyers]." *Id.*

¶ 125 Notably, *Uptown* does not merely present the example of a nonprofit organization whose in-house lawyers provided the representation—it was a nonprofit *legal* entity that "represent[ed] prisoners regarding conditions of confinement." *Id.* ¶ 3.

¶ 126 For understandable reasons, the court in *Uptown* did not discuss *Kay* or these federal cases but instead focused on *Hamer*—understandable because *Uptown* considered the same statutory fee provision interpreted in *Hamer*, the FOIA fee provision. Still, we are *not* construing FOIA, and so in taking *Uptown* into account, it is fair to note that it runs directly counter to *Kay*—at least to *Kay*'s footnote—as well as the federal circuit court decisions we have discussed above. Even the Michigan Supreme Court, distinguishing those cases and reading the *Kay* footnote differently, conceded that the Supreme Court was clearly talking, approvingly, about in-house counsel's work for an organizational plaintiff in that footnote. See *Fraser Trebilcock*, 870

- 21 -

N.W.2d at 500-01. The organizational plaintiff in *Uptown* would fall, at least arguably, within the *Kay* footnote's reference.

¶ 127 Finally, we would note that this court earlier ruled that a law firm seeking to collect unpaid fees from a client could not collect attorney fees performed by two of that law firm's member lawyers, Mr. Jacquays and Ms. Kennison. *In re Marriage of Tantiwongse*, 371 Ill. App. 3d 1161, 1164-65 (2007). Without distinguishing between plaintiff-law firms and individual plaintiff-lawyers, the court simply relied on *Hamer* to hold that these two lawyers were "representing themselves" in the collection action and "could not incur any legal fees on their own behalf." *Id.* Thus, though the court there did not explain why, the court appeared to unhesitatingly apply *Hamer* in the context of a plaintiff-law firm representing itself.

¶ 128 Having taken all of this case law into account, it is our judgment that relator should not be allowed to recover attorney fees in this instance. We reach this holding, and do not follow the case law cited by relator, for several reasons.

¶ 129 First, the federal circuit court decisions that favor relator's position were focused, properly so, on *Kay*. But *Kay*'s holding—and its footnote—focused on the presence of an attorney-client relationship and nothing more. The entire point of the holding in *Kay* was that an independent lawyer was necessary to counsel the plaintiff-lawyer, to provide an objective, detached view of the case. Likewise, the entire point of footnote 7 in *Kay* was that organizational plaintiffs are different because in *that* context, an attorney-client relationship *always* exists. Accordingly, as we noted above in detail, the federal circuit court decisions repeatedly emphasized that an attorney-client relationship *did* exist in the context of a plaintiff-law firm and its member lawyers, and thus, the concern in *Kay* was satisfied.

¶ 130 But it is possible to agree with that assessment and still reach a different outcome under Illinois law. We agree without hesitation that, in this case, relator had an attorney-client relationship with its member lawyers. Of course it did. A corporation cannot appear in court without a lawyer representing it. *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 22 ("Courts in this country, including this court, unanimously agree that a corporation must be represented by counsel in legal proceedings."). And nothing prevents a corporation of any kind—a law firm or any other company—from using its own, in-house, salaried lawyers in court. See, *e.g.*, *Uptown*, 2014 IL App (1st) 130161, ¶ 25. If our only concern were whether an attorney-client relationship existed between relator and its member lawyers, we would agree with relator's position.

¶ 131 But *Kay*, and its singular consideration, is not our only concern. Our supreme court's decision in *Hamer*, while not directly on point because it involved a *pro se* individual plaintiff-lawyer rather than a corporate entity that cannot appear *pro se*, nevertheless is instructive in that it considered an attorney-fee provision much like ours and raised several public policy reasons in interpreting that provision. When we analyze the policy considerations raised in *Hamer*, we find that they favor denying fees to relator in this case.

¶ 132 Under the first *Hamer* consideration, we consider the purpose of the fee provision. The purpose of the Act is to reveal fraud against the government. See *Ritz Camera*, 377 Ill. App. 3d at 996. The fee-shifting provision in the Act incentivizes individuals to ferret out such fraud by removing the burden of legal fees as a deterrent. We do not view the fee provision as a reward for successful relators. The Act rewards prevailing relators in other ways. It provides for an award of 25% to 30% of the proceeds of the lawsuit to a relator who handles the litigation from start to finish, without the State's intervention. 740 ILCS 175/4(d)(2) (West 2012). It awards a

smaller share to a prevailing relator in cases where the State intervenes—15% to 25%, "depending on the extent to which the [relator] substantially contributed to the prosecution of the action." 740 ILCS 175/4(d)(1) (West 2012). Thus, the successful relator-law firm is not only rewarded, but rewarded (at least roughly) based on the amount of effort it expended. To reward that law firm for its efforts *again*, this time based on an hourly fee rate, strikes us as a double recovery.

¶ 133    And while an action under the Act could bring along with it a rich bounty for the relator—as it did in this case—that is not necessarily always true. Here, the reverse false-claims action snared a defendant with significant sales in Illinois, but a false-claims action (particularly a traditional one) could very well reveal fraud against the government in a far smaller amount. The relator would still get its 25% to 30% of the recovered proceeds, but it could be 25% to 30% of an amount so small that it is not worth the cost of paying a lawyer to fight the case, on an hourly-fee basis, for several years. And even in a case like this one, where the amount of recovery was larger, a relator could lose part of its case—as it did here, regarding craft-show sales. The fee provision in the Act permits citizen-relators to ferret out fraud even when the reward at the end of the rainbow would not ordinarily warrant the cost of litigation.

¶ 134    Relator could argue that the legal fees *are* a burden because of the opportunity cost—the time that its member lawyers could have spent on other matters instead of this one. We do not agree, first, because this particular relator's attorneys do not appear to perform any legal work *other than* these false-claims cases. They are not taking time away from other clients to perform this work; this work is the only work they do. More importantly, we reject this reasoning because the same thing could have been said of Mr. Hamer in the *Hamer* decision—he was an attorney at a "large Chicago law firm" (*Hamer*, 132 Ill. 2d at 62) who presumably could have used the time litigating the FOIA case to bill hours on work for the law firm's clients. He certainly had more profitable ways to spend his time than litigating a FOIA case, but the supreme court nevertheless reasoned that legal fees did not present an obstacle to him because he was capable of performing the legal work himself.

¶ 135    And the same thing could have been said of the lawyers representing the Uptown People's Law Center in *Uptown*, 2014 IL App (1st) 130161. The lawyers in that case could have been spending their time on other lawsuits involving prisoners' rights but that did not persuade this court that attorney fees were appropriate or consistent with the fee-shifting provision in the FOIA. *Id.* ¶ 25 (because organizational plaintiff had salaried, in-house counsel, "legal fees were never a burden that Uptown was required to overcome in order to pursue its FOIA requests").

¶ 136    The same is true of relator here. We thus find that the purpose of the fee-shifting provision—to eliminate the barrier of attorney fees—would not be served by awarding fees to a relator that is both client and attorney.

¶ 137    The second consideration discussed in *Hamer* was the need for an objective, detached viewpoint of independent counsel—much the same as the concern in *Kay*. We acknowledge that the *Kay* footnote seemed to bless the concept of in-house counsel representing its corporation—its singular client. We also acknowledge that this relator appears to function in a manner unlike a traditional law firm, that it seems to exist only for the purpose of filing, as a party-plaintiff, false-claims cases. Its lawyers might appear to be more like in-house counsel for an organizational plaintiff than lawyers at a law firm with assorted clientele.

¶ 138    On the other hand, the traditional corporation with "in-house counsel" is not a corporation where all of the shareholders are lawyers, like a law firm. The "in-house counsel" for a traditional corporation would typically be giving his or her opinion to people who do not actively practice law or, at least, are not experts in the particular field. There is at least some measure of "independence" in that context, in that the "in-house" lawyer would be guided by what he or she believes to be the merits of the case, providing objective advice to a client whose interests and motivations may be contrary to that objective advice.

¶ 139    In the specific context before us, we are not convinced of the "independence" of the relator's lawyers from the relator itself. We are not intimately familiar with the relator's corporate structure, but we know this much: First, the company is presently incorporated as Stephen B. Diamond, P.C. (formerly Schad, Diamond & Shedden, P.C.), and Diamond testified at trial that he is the president of the corporation and has been since Mr. Schad's death approximately seven years ago. Second, Diamond testified that he, personally, made at least one of the purchases of products from My Pillow, using his personal credit card on the Internet while driving to Wisconsin. Third, Diamond performed legal work on this case, as indicated by the fee petitions and as disclosed in the record, in that he conducted the direct examination of relator's principal witness, Lindell of My Pillow. It would be fair to say that Diamond was the lead counsel at the rather brief trial—as well as a witness called in My Pillow's case-in-chief.

¶ 140    If the same person is both the final decision-maker at the client-corporation—its president—and the lead attorney giving advice to the decision-maker, do we have the requisite "independence" envisioned by these federal circuit courts relying on the *Kay* footnote? If the corporate decision-maker and the lead counsel are one and the same person, our situation would seem to be more along the lines of the holding in *Kay*—denying fees for lack of objective, independent counsel—than the organizational exception in the *Kay* footnote, allowing fees for work performed by in-house counsel.

¶ 141    The second *Hamer* consideration thus provides marginal assistance, if any, to relator's position.

¶ 142    The third consideration in *Hamer* was the potential for abusive fee generation, the notion that a law firm with an otherwise "inactive practice" would make a business out of filing lawsuits under a statute such as the FOIA with a fee-shifting provision. *Hamer*, 132 Ill. 2d at 62. In that regard, the FOIA could become less about vindicating citizens' rights to information and more about generating legal fees for a law firm.

¶ 143    We recognize that, whatever one may think of relator's practice, it does perform the valuable service of uncovering fraud against the State, primarily discovering companies that are selling products in Illinois but failing to remit and collect use taxes. The result is that the State is able to recover much-needed tax money going back several years and going forward, as well—revenue it quite possibly never would have recovered otherwise.

¶ 144    But that does not alter the fact that this relator has made a business out of filing these false-claims cases as a party-plaintiff. The record discloses the trial court's notation that at one point early on in the development of relator's practice, relator had filed 157 such lawsuits. My Pillow, in its brief, says that relator has filed over 600 such lawsuits in Illinois, and relator has not taken issue with that number. Our review of the docket of the circuit court of Cook County indicates that hundreds of cases are currently pending bearing relator's name. See https://courtlink.lexisnexis.com/cookcounty/FindDock.aspx?NCase=&SearchType=2&Datab ase=2&case_no=&Year=&div=&caseno=&PLtype=1&sname=Stephen+Diamond&CDate

(last accessed May 17, 2017). And we can attest that it is virtually impossible to conduct legal research regarding the Act without constantly running into decisions bearing the relator's name as the plaintiff (or its predecessor name of Schad, Diamond & Shedden, P.C.), many of which we have cited in this opinion.

¶ 145    It is true that a relator receives a reward, a percentage of the proceeds, for ferreting out these nontaxpayers. But it is also true, as we noted earlier, that not all of these cases result in large money judgments, and it is quite likely that the 25% to 30% of the proceeds will pale in comparison to the award of attorney fees. This case is an example. The "proceeds" from this action—the amount that My Pillow failed to pay, trebled—was $889,637, a sizeable number by any estimation. From that amount, relator recovered the maximum 30% fee of $266,891. Compare that maximum-rate recovery, in a case involving significant proceeds, with the amount relator recovered for attorney fees and costs: $600,960. Even granting that a small portion of that award could be shaved off for the "costs" aspect of fees and costs, the attorney-fee award was still more than double relator's statutory recovery of proceeds. And that was in a case involving significant revenue; imagine the disparity should relator litigate roughly the same case, for roughly the same amount of time, resulting in roughly the same amount of attorney fees, in a case where the resulting proceeds are far smaller. The fee award could dwarf a relator's statutory recovery of the proceeds.

¶ 146    It is hard to imagine, in other words, that the prospect of earning fees is not a significant driver in the decision to file these cases. It is presumably the reason why relator chooses to file these lawsuits in the name of the law firm and perform (or at least primarily perform) the legal work on the case, too—to obtain both the statutory percentage of recovery as well as attorney fees. In any event, even if this is not relator's intention, *Hamer* tells us to consider the *potential* for abusive fee generation, even if not present in the situation currently before us (as it was not in *Hamer*), and we can, at a minimum, find the potential for abusive fee generation if attorney fees were awarded to a law firm that was both relator and attorney.

¶ 147    Relator, at oral argument, reminded us of the value of the service relator performs and warns that it may not be able to provide this service going forward should this court rule against it on this issue. Again, we do recognize the value of relator's legal work to the State of Illinois. It is not our intention to have any such devastating impact, but rather to interpret this fee provision consistent with our supreme court's consideration of various factors. Moreover, nothing we have said prevents this law firm from continuing to practice in its specialty of false-claims actions. It will simply not be able to serve as the client simultaneously—at least not if it wants to recover attorney fees.

¶ 148    For all of these reasons, we hold that the fee-shifting provision in the Act does not permit the award of attorney fees to relator, who served as its own attorney for much of this case. To the extent that the trial court awarded relator fees for work performed by relator's own attorneys, that fee award is reversed.

¶ 149              b. Attorney Fees Related to Unsuccessful Claims Regarding Craft Shows

¶ 150    My Pillow also argues that the trial court erred in awarding attorney fees for work relator performed relating to the craft shows since relator did not prevail on any claims related to those craft shows.

¶ 151    We have already decided that relator was not entitled to any attorney fees whatsoever for its own legal work. But we will address this argument to the extent that its resolution affects the

trial court's recalculation of attorney fees regarding services performed by those attorneys hired by relator.

¶ 152 On this issue, which does not question the court's authority to impose fees but, rather, concerns whether the court properly exercised that authority, we apply an abuse-of-discretion standard. *Grate*, 373 Ill. App. 3d at 231. We will overturn an award of fees under this deferential standard "only where the trial court acts arbitrarily, without conscientious judgment, or, in view of all of the circumstances, it exceeds the bounds of reason and ignores recognized principles of law, thereby resulting in substantial injustice." *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 39.

¶ 153 My Pillow claims that whether it submitted false claims related to its craft show sales (for which My Pillow was found not liable) and whether it submitted false claims related to its Internet and telephone sales (for which it was liable) are "two distinct questions." In awarding attorney fees related to relator's work regarding the craft shows, the trial court relied, in part, on *Berlak v. Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231 (1996). The trial court noted that, in Illinois, a party petitioning pursuant to a fee-shifting statute is entitled to obtain fees for all work involving "a common core of facts" or "based on related legal theories." (Internal quotation marks omitted.) *Id.* at 238. The trial court concluded that relator's claims were all based on a common core of facts and related legal theories, entitling relator to its attorney fees and expenses related to its trade and craft show claims.

¶ 154 This rationale has also been applied in federal False Claims Act cases. See *United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d 458 (5th Cir. 2009). In *Longhi*, the court noted that when a plaintiff's claims for relief " 'involve a common core of facts' " or are " 'based on related legal theories,' " much of counsel's time will be " 'devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.' " *Id.* at 476 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)).

¶ 155 We find that reasoning persuasive and applicable to this case. The trial court found that much of the work relator performed overlapped the different areas of alleged false claims and determined that it would be inappropriate to dice up the claims in awarding fees.

¶ 156 The trial court's judgment on this question was reasonable and supported by case law. We cannot say that its decision was arbitrary, without conscientious judgment, or so unreasonable as to result in substantial injustice. *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 39. Thus, the trial court did not abuse its discretion by awarding relator fees for legal work (performed by outside counsel) relating to the craft show claims.

¶ 157                                        IV. CONCLUSION

¶ 158 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County in favor of relator as to the false claims regarding Internet and telephone sales. We reverse that portion of the attorney-fees award for legal services performed by relator's own member lawyers; the fees that were awarded for services performed by outside counsel retained by relator shall stand. We remand this matter only for a recalculation of the attorney-fees award consistent with this opinion.

¶ 159 Affirmed in part and reversed in part; cause remanded.